972 F.2d 1483
 1992-2 Trade Cases P 69,935
 AMERINET, INC., a Minnesota corporation, doing business as
Amerinet/Genesis; Kaibab National Group, Inc., a
Minnesota corporation, doing business as
Genesis Systems Corporation, Appellants,
v.
XEROX CORPORATION, a New York corporation, Appellee.
 Nos. 91-2099, 91-2110.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 11, 1991.
Decided Aug. 26, 1992.
 
 1
 A.H. Hoddinott, Jr., Stamford, Conn., argued (Peter Dorsey, Steven J. Wells and Sri K. Sankaran, Minneapolis, Minn., on the brief), for appellants.
 
 
 2
 Leonard W. Schulz, Big Bend, Wis., argued, for appellee.
 
 
 3
 Before BEAM, Circuit Judge, LOKEN, Circuit Judge, and KAUFMAN,* Senior District Judge.
 
 
 4
 FRANK A. KAUFMAN, Senior District Judge.
 
 
 5
 On May 13, 1987, plaintiffs below and appellees/cross-appellants herein, Amerinet, Inc. and Kaibab National Group, Inc. (hereinafter, collectively Amerinet),[1] seeking equitable relief and compensatory and punitive damages, sued defendant below and appellant/cross-appellee herein, Xerox Corporation (hereinafter Xerox), for monopolization, attempted monopolization, and maintenance of an illegal tying arrangement,[2] in violation of Sections 1 and 2 of the Sherman Act,[3] and for unfair competition, business disparagement, defamation and tortious interference with prospective contractual relations. In connection with its federal antitrust claims, Amerinet sought treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 (1980). Jurisdiction is present with regard to each and all of Amerinet's claims pursuant to one or both of 28 U.S.C. §§ 1332 and 1337. Diversity jurisdiction exists because all of plaintiffs/appellees are incorporated and have their principal places of business in Minnesota, and defendant/appellant, Xerox, is incorporated in the State of New York and has its principal place of business in a state other than Minnesota.
 
 
 6
 Amerinet's federal and state claims are based upon certain maintenance policies utilized by Xerox and upon certain behavior by Xerox towards customers or potential customers of Amerinet which allegedly, in 1987, prevented plaintiffs from selling certain used Xerox laser printers and certain other non-Xerox products. In a written unpublished Memorandum Opinion and Order dated July 11, 1989, the court below granted summary judgment in favor of Xerox with regard to all of Amerinet's antitrust claims and its business disparagement claim and dismissed Amerinet's request for punitive damages.[4] The district court, however, denied summary judgment as to Amerinet's claims for defamation and tortious interference with prospective business relations.[5] On October 4, 1989, the district court denied Amerinet's motion for a redetermination of its July 11, 1989 Order. A jury trial commenced in November, 1989 with respect to Amerinet's defamation and tortious interference claims.[6] Because of the trial court's decision granting summary judgment on Amerinet's antitrust claims, it ruled that evidence of Xerox's maintenance policies was admissible at trial only on the issue of Xerox's intent. The jury was accordingly so instructed. During trial, the district court denied Xerox's motions for a directed verdict. On February 15, 1991, the jury returned a $1,000,000 verdict for Amerinet on its tortious interference with prospective business claim,[7] and final judgment was entered on February 25, 1991. Thereafter, on April 15, 1991, the trial court in a written Order denied Xerox's motions for a new trial, for judgment notwithstanding the verdict, and/or for remittitur.
 
 
 7
 In this appeal, Xerox asserts that (1) the district court's denial of its motions for a directed verdict and for judgment notwithstanding the verdict constituted error, (2) the failure of Amerinet to produce any evidence concerning the issues of causation and damages requires reversal of the trial court judgment, and (3) the district court's failure properly to instruct the jury with regard to Amerinet's burden of proof concerning the competitor's privilege and damages warrants a new trial. Amerinet, cross-appealing, claims that the district court erred by granting Xerox summary judgment on Amerinet's antitrust and business disparagement claims and by refusing to allow Amerinet to seek punitive damages.
 
 
 8
 For the reasons stated in this opinion, the district court's grant of summary judgment in favor of Xerox is affirmed, and that court's denial of Xerox's motion for judgment notwithstanding the verdict is reversed.
 
 I.
 Facts[8]
 
 9
 Amerinet, a company founded in 1980, was a broker and reseller of new and used computer equipment. Amerinet normally did not carry an inventory of equipment and generally did not purchase any equipment until it had already arranged to sell that equipment to a third party. Amerinet did not manufacture, service, inspect, or upgrade the equipment which it sold. Amerinet first attempted to sell used[9] Xerox laser printers in 1986. In that year, Amerinet, testing the used Xerox laser printer market, sold two such printers, one to Meijer Corporation (hereinafter Meijer) in August, and one to Franklin Mint in December. Those sales yielded gross profits of approximately $65,000 and $45,000, respectively. Although Amerinet, in 1987, increased its efforts to market used Xerox laser printers, Amerinet sold no more of those machines. By May, 1987, Amerinet had ceased soliciting new business for those printers and was marketing them only to a minimal extent, if at all. On November 29, 1988, Amerinet went out of business.
 
 
 10
 The used Xerox laser printers which Amerinet attempted to market belong to a sophisticated family of expensive Xerox laser printers, known as the 8700 and 9700 models.[10] Amerinet asserts that the 8700 and 9700 series of Xerox laser printers were unique in 1987 in that they could at high speed (1) feed cut sheets with a resolution of 300 X 300 dots per inch, (2) print on both sides of the paper in one pass (duplex), and (3) with an attachment found on approximately 10% of such machines in use, print with ink readable by computers, a feature known as Magnetic Ink Character Recognition (MICR). The operators of the 8700 and 9700 models require a dependable and continuous source of maintenance for those printers because those machines are complex, are used for high volume printing, and often need to be modified before they can perform certain other functions. As a result, almost all users of those Xerox laser printers purchase separately a Full Service Maintenance Agreement (FMSA) from Xerox which generally provides that for a fixed fee Xerox will maintain, repair and/or upgrade the equipment for a specific period of time. Xerox has a nationwide service organization which is equipped to provide prompt service 24 hours a day, 365 days a year. During the relevant time period, Xerox provided such service and maintenance with regard to approximately 98% of the 8700 and 9700 model printers. Few, if any, independent service organizations were able to offer such full service on those printers. It is common practice in the industry for a manufacturer to issue letters of certification stating that its used equipment has been under full service maintenance and is certified as eligible for continued maintenance by the manufacturer at a new location. Some manufacturers issue those letters without inspecting the relocated equipment if the equipment was under a maintenance agreement at the original location. Xerox provides letters of certification of maintenance for its equipment and, with regard to all of the printers at issue herein, Xerox never refused or failed to provide a letter of certification.
 
 
 11
 In January, 1985, Xerox stated, in its Full Service Maintenance Agreement, that it would guarantee maintenance availability for a period of seven years from the date of initial installation of a Xerox machine. Prior to 1985, Xerox had set no limit on the availability of its maintenance services.[11] On January 1, 1987, Xerox adopted a supplement[12] to its FMSA which provided, inter alia, that the seven-year maintenance guarantee was non-transferable, and that if maintenance was sought after a title transfer, Xerox would inspect the machine for a fee at Xerox's published rate, submit a written estimate of charges necessary to maintain full service maintenance for one year, and then, if it so chose, would provide assured availability of maintenance on a year-to-year basis. In addition, Xerox in that January, 1987 supplement reserved the right, upon the expiration of the period of assured availability of maintenance, to assess an annual service surcharge not greater than ten percent of the annual full service maintenance charge. In October, 1987, Xerox made the period of assured availability of its FMSA transferable, subject to inspection and renovation, if needed, by Xerox at its published rates.
 
 II.
 SUMMARY JUDGMENT STANDARD
 
 12
 This Court, in reviewing the district court's grant of summary judgment, determines de novo whether summary judgment is properly granted, Lone Ranger Television v. Program Radio Corp., 740 F.2d 718, 720 (9th Cir.1984), and may consider only the claims and evidentiary materials before the trial court at the time the summary judgment ruling was made. See 10 Charles A. Wright et al., Fed.Prac. and Proc. § 2716 at 650-654 (1983).[13] Although " 'on summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion,' " Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)), "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting FED.R.CIV.P. 56(e)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ..." Id. at 323-24, 106 S.Ct. at 2553. In complex antitrust cases, no different or heightened standard for the grant of summary judgment applies. City of Mt. Pleasant, Iowa v. Associated Electric Cooperative, Inc., 838 F.2d 268, 274 (8th Cir.1988) (citing as example Matsushita, 475 U.S. 574, 106 S.Ct. 1348 (1986)). See also Eastman Kodak Co. v. Image Technical Services, Inc., --- U.S. ----, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). "Especially in cases where motive and intent are not determinative, summary judgment may be used in antitrust actions." Robert's Waikiki U-Drive, Inc. v. Budget Rent-A- Car Systems, Inc., 732 F.2d 1403, 1406 (9th Cir.1984).
 
 III.
 ANTITRUST CLAIMS
 A. Monopolization Claims
 
 13
 In order to succeed on a monopolization claim under Section 2 of the Sherman Act, Amerinet must prove that Xerox (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining that power as a result "of a superior product, business acumen, or historical accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). See Eastman Kodak Co., --- U.S. at ----, 112 S.Ct. at 2088. In order to maintain an attempted monopolization claim under Section 2, Amerinet must prove: "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." General Industries Corp. v. Hartz Mountain Corp., 810 F.2d 795, 801 (8th Cir.1987). In addition, a plaintiff, such as Amerinet, "seeking treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, must establish an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages." Rosebrough Monument Co. v. Memorial Park Cemetery Assoc., 666 F.2d 1130, 1146 (8th Cir.1981). See also Green v. Assoc. Milk Producers, Inc., 692 F.2d 1153, 1157-58 (8th Cir.1982) ("To recover under Section 4 of the Clayton Act," plaintiff "must establish a causal relationship between the alleged antitrust violation and the injury suffered."); Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 893 (8th Cir.1978). The amount of antitrust damages which are required to be demonstrated "must be capable of reasonable ascertainment and must not be speculative or conjectural." Admiral Theatre Corp., 585 F.2d at 893 (citing Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)).
 
 
 14
 The thrust of Amerinet's monopoly and attempted monopoly claims under Section 2 of the Sherman Act[14] is that Xerox utilized the January, 1985 and the January, 1987 provisions of its FSMA to preclude Amerinet from selling used Xerox laser printers. Amerinet claims that it failed to sell any used Xerox laser printers after January 1, 1987 because Xerox's January 1, 1987 supplement made the period of assured availability of maintenance nontransferable and the availability of maintenance after the assured period prohibitedly expensive and uncertain. Amerinet further contends that its loss of used Xerox laser printer sales caused it to go out of business. Amerinet cites, as specific examples of such losses, its failure to sell two used Xerox laser printers to Massachusetts Mutual and one such printer to New York Life Insurance Company.
 
 
 15
 The district court, in evaluating the merits of Xerox's motion for summary judgment on Amerinet's monopolization claims, concluded that genuine issues of material fact existed as to all of the elements of those claims, except for damages. The district court determined that Amerinet's pleadings and supporting papers raised disputed material facts with regard to the scope of the relevant market, whether Xerox possessed monopoly power in that undetermined relevant market, whether Xerox specifically intended to restrain competition unreasonably, whether Xerox committed overt acts of monopolization, and whether Xerox's success in monopolization was probable. The district court, however, granted summary judgment in favor of Xerox on Amerinet's monopolization claims because Amerinet failed to adduce adequate evidence of its alleged antitrust injury, of its allegation that Xerox's anticompetitive conduct caused that injury, and of a reasonable factual basis upon which to calculate the amount of damages Amerinet allegedly suffered. More specifically, the district court concluded that Amerinet failed to provide sufficient evidence of its allegation that Xerox's alleged anticompetitive conduct drove Amerinet out of business or caused Amerinet to lose sales, failed to distinguish any alleged antitrust injury from business declines resulting from lawful competition, and produced expert testimony which was not grounded upon specific facts and which would have failed to provide to the trier of fact a factual basis upon which to determine the amount of Amerinet's alleged damages without engaging in speculation or conjecture.
 
 
 16
 On appeal, Amerinet contends that the district court erred in granting Xerox's motion for summary judgment on Amerinet's monopolization claims. Amerinet does not dispute the applicability of Rosebrough to its monopolization claims or that it must demonstrate the following in order to recover treble damages for its antitrust injury: (1) the fact of damage or injury, (2) a causal relationship between the antitrust violation and the injury, and (3) the amount of damages. Rather, Amerinet challenges the district court's grant of summary judgment on its monopolization claims on the ground that Amerinet provided sufficient evidence of the Rosebrough elements to survive a motion for summary judgment. Amerinet maintains that the district court misapplied the relevant antitrust law and imposed upon Amerinet, at the summary judgment stage, the requirement of showing all the facts necessary to prove its claims at trial.
 
 
 17
 In the face of Xerox's motion for summary judgment, Amerinet offered to the trial court the following as factual support for the existence of the Rosebrough elements. Amerinet argued that the plain language of the January 1, 1987 supplement is anticompetitive on its face because it conditions the availability of maintenance upon whether title to a machine has been transferred, not upon factors relating to the machine's physical condition, such as age, location, or prior maintenance status. Amerinet submitted the sworn affidavit of Amerinet's president, Philip L. Brandsey, which stated that from the end of October, 1986 through March, 1987, Amerinet identified over 350 potential buyers of used Xerox laser printers, and negotiated with and made offers to over 100 of those companies. Mr. Brandsey, in his affidavit, testified that Xerox's January 1, 1987 supplement embodied a policy and practice contrary to industry standards and that that supplement was the sole cause of Amerinet's inability to sell any used Xerox laser printers after January, 1987. In his affidavit, Mr. Brandsey also attested to the fact that the list price of a new Xerox laser printer is approximately $400,000 and that a reasonably priced used Xerox laser printer costs approximately $275,000. Amerinet claims that the deposition testimony of a Xerox employee, Mr. Prefontaine, demonstrates that used Xerox laser printers, under full service maintenance, perform as well as new Xerox laser printers, and argues that it is plain that as long as maintenance is available from Xerox, potential customers should be interested in buying the less expensive used equipment.
 
 
 18
 In support of its claims of loss of two sales to Massachusetts Mutual, Amerinet points to the deposition statement of Mr. Bologna, an employee of Massachusetts Mutual who participated in Mutual's decision to buy a laser printer from Xerox instead of from Amerinet. Mr. Bologna stated that the terms of the January 1, 1987 supplement were "a consideration" in Mutual's decision. Amerinet also refers to cost analyses prepared by a Xerox representative at Mutual's request which indicated that because of the possible annual 10% surcharge on used machines, a used machine over a five year period could cost approximately $63,000 more than a new printer. Amerinet notes that without the possible 10% surcharge, the used printer's operating cost, over a period of five years, would be $120,000 less than that of a new printer. It is not disputed that after Xerox's cost analyses were considered by Mutual, the latter purchased two new laser printers from Xerox and none from Amerinet; however, the record is unclear as to the date of those sales.
 
 
 19
 With regard to Amerinet's lost sale to New York Life Insurance Company, Amerinet notes that John F. Hines, an employee of New York Life, stated that Xerox's January 1, 1987 supplement gave New York Life "some concern" over whether maintenance services would be available if New York Life purchased a used machine.[15] Amerinet also refers to the following three documents, each of which outlines the benefits and drawbacks of purchasing a new laser printer from Xerox as opposed to a used one from a third party: a memorandum from Mr. Hines to another New York Life employee, dated January 24, 1987, a handwritten memorandum composed by Mr. Hines presumably around the same point in time, and a brief analysis prepared by a Xerox sales representative for New York Life.
 
 
 20
 Amerinet further alleges that Xerox's actions in connection with Amerinet's sale of a used Xerox laser printer to Meijer were anticompetitive. In June, 1986, Amerinet offered to sell Meijer a used Xerox laser printer for $295,000. At that same time, Xerox offered to sell Meijer the laser printer Xerox had been leasing to Meijer for $345,000. Amerinet claims that upon learning of Amerinet's offer, Xerox disparaged the quality of used equipment, threatened for a while not to supply maintenance for the machine Amerinet was offering, and then offered Meijer maintenance for that machine, but at a higher rate than that offered for a printer bought from Xerox and with possible extra fees, such as for certification and inspection. Amerinet claims that because of those statements and actions by Xerox, Amerinet was forced to sell Meijer a printer at a reduced price, $268,000. After Amerinet completed its sale to Meijer, Xerox allegedly was extremely slow in installing the printer at Meijer's location and in delivering the parts and upgrades ordered for the Meijer machine. Moreover, Amerinet claims that after the machine was installed and certified, Xerox personnel falsely advised Meijer that the machine was in poor condition, that a used machine would not perform to the levels of a new machine, and needlessly conducted $27,000 worth of repairs, for which Meijer was billed. Amerinet maintains that Meijer blamed Amerinet for all of the problems Xerox caused Meijer in the upgrade and installation of Meijer's machine. Amerinet, however, does not claim that Xerox refused or failed to certify the Meijer machine for full service maintenance.
 
 
 21
 Amerinet contends that the deposition and affidavit testimony of its damages expert witness, Mr. Litvak, a CPA, supports its allegation that Amerinet's lost Xerox sales were the proximate cause of the destruction of its business, that the measure of Amerinet's damages is the fair market value of Amerinet's business before January 1, 1987 less its fair market value as of the date of trial, and that those damages range from 1,400,000 to 4,000,000, depending upon the methodology employed. Lastly, Amerinet provided the deposition and affidavit testimony of an expert witness in economics, Dr. Patricia Pacey, who stated that "customers ... [and] small rivals of Xerox are adversely affected by the new policies and practices of Xerox...."[16]
 
 
 22
 A treble-damage plaintiff is not required to prove exactly and with total certainty the amount of antitrust damages which it has sustained, if that plaintiff clearly demonstrates that the defendant's antitrust violations caused its antitrust injury. In Bigelow v. RKO Radio Pictures, Inc., the Supreme Court stated the well-established rule on treble damages that in cases in which the defendant's wrongdoing has precluded a more accurate ascertainment of the plaintiff's damages:
 
 
 23
 the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damages to the plaintiffs....
 
 
 24
 [However,] even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury [in such a case] may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.... Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.
 
 
 25
 Bigelow, 327 U.S. 251, 264-65, 66 S.Ct. 574, 579-80 (1946). See also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-24, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). The relaxed standard of proof with regard to the amount of antitrust damages does not apply, however, to the plaintiff's burden of proving fact or causation of antitrust injury.
 
 
 26
 [T]here is a clear distinction between the measure of the proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.
 
 
 27
 Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). See also MCI Communications Corp. v. American Telephone and Telegraph Co., 708 F.2d 1081, 1161 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); Rosebrough, 666 F.2d at 1146; R.S.E., Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954, 963 (M.D.Pa.1981). Thus, the plaintiff earns a more lenient standard of proof with regard to the amount of damages only when the plaintiff has shown that it has in fact suffered antitrust injury caused by the defendant's anticompetitive wrongdoing.
 
 
 28
 If a plaintiff has suffered financial loss from the lawful activities of a competitor, then no damages may be recovered under the antitrust laws. It is a requirement that an antitrust plaintiff must prove that his damages were caused by the unlawful acts of the defendant. See 15 U.S.C. § 15 (1980). This is the essence of "antitrust injury" as set forth by the Supreme Court ... [in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) ].
 
 
 29
 Once causation of damages has been established, the amount of damages may be determined by a just and reasonable estimate as long as the jury verdict is not the product of speculation or guess work.
 
 
 30
 MCI Communications Corp., 708 F.2d at 1161 (citing J. Truett Payne Co. v. Chrysler Motor Corp., 451 U.S. 557, 566-67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981); Zenith Radio Corp., 395 U.S. at 123-24, 89 S.Ct. at 1576-77) (emphasis in original). See also R.S.E., Inc., 523 F.Supp. at 963-64. The case law is clear, moreover, that the treble-damage plaintiff may not recover for losses due to factors other than the defendant's anticompetitive violations.
 
 
 31
 When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of "speculation or guesswork" not permitted for antitrust jury verdicts. Bigelow, 327 U.S. at 264, 66 S.Ct. at 579. To allow otherwise would force a defendant to pay treble damages for conduct that was determined to be entirely lawful.
 
 
 32
 MCI Communications Corp., 708 F.2d at 1162. See also Zenith Radio Corp., 395 U.S. at 125-26, 89 S.Ct. at 1577-78; Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1352-53 (3d Cir.1975); R.S.E., Inc., 523 F.Supp. at 964-65; ILC Peripherals Leasing Corp. v. International Business Machines Corp., 458 F.Supp. 423, 434 (N.D.Cal.1978).
 
 
 33
 On appeal Amerinet contends that under Rosebrough, Bigelow, and Moore v. Jas. H. Matthews & Co., 682 F.2d 830 (9th Cir.1982), an antitrust plaintiff need not show evidence of specific lost sales in order to prove damages, but rather, "is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." Moore, 682 F.2d at 836. Amerinet emphasizes that the United States Supreme Court in Bigelow stated that "the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." 327 U.S. at 264, 66 S.Ct. at 579. As to causation, Amerinet also maintains that Zenith Corp., 395 U.S. at 114, 89 S.Ct. at 1571, instructs that an antitrust plaintiff is required to show only that the defendant's conduct was a material cause of its injury, but is not required to exhaust all possible alternative sources of injury to sustain its burden of proof.
 
 
 34
 The district court concluded that Amerinet did not provide enough evidence of antitrust injury, causation, and damages to survive Xerox's motion for summary judgment. Drawing all reasonable inferences from the evidentiary materials provided in favor of Amerinet, as this Court must in the summary judgment context of this case, this Court agrees with the district court that Amerinet failed sufficiently to establish the causal connection between its decline and Xerox's alleged antitrust violations and also failed to establish any reasonable basis for the determination of its damages.
 
 
 35
 Amerinet began seeking customers for used Xerox laser printers in earnest at the very earliest in October, 1986 and ceased soliciting new prospective buyers for those machines at the latest in May, 1987, approximately eight months later. As the district court noted, it is difficult to reasonably imagine how Xerox's alleged anticompetitive conduct could completely destroy Amerinet's viability in that eight month period. The fact remains, moreover, that Amerinet did not actually go out of business until November, 1988, over a year and a half after Amerinet stopped soliciting new buyers for used Xerox laser printers. "It follows from ... settled principals that if the factual context renders respondents' claim implausible--and if the claim is one that simply makes no economic sense--respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Matsushita Elec. Industrial Co., 475 U.S. at 587, 106 S.Ct. at 1356. Matsushita, however, "did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases.... Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." Eastman Kodak Co., --- U.S. at ----, 112 S.Ct. at 2083 (footnote omitted). In the Supreme Court's opinion in Eastman Kodak Co., damages issues of the type discussed herein were not a point of focus.
 
 
 36
 Amerinet properly emphasizes that, in order to provide sufficient evidence of causation under Bigelow, it need only establish that Xerox violated the antitrust laws, that Xerox's alleged violations had a tendency to injure Amerinet's business, and that Amerinet suffered a decline in its business "not shown to be attributable to other causes." 327 U.S. at 264, 66 S.Ct. at 579. Amerinet's own assertions and the statements of its own damage expert witnesses strongly suggest, however, that Amerinet's decline was caused at least partly by, if not substantially or mainly by, other factors than Xerox's alleged antitrust violations, and that in 1985 those other factors had already caused and were continuing to cause some decline on Amerinet's part. Amerinet stated in its opposition to Xerox's motion for summary judgment that in 1985, Amerinet's President, Mr. Philip L. Brandsey, evaluated Amerinet's sales domain at that time and "realized that, with the number of resellers in the IBM and communications products markets, the profit margins on those products would probably decrease further and that his company had to look in other directions. He decided that he needed to move into the sale and lease of new as well as used equipment."[17] The deposition testimony of one of Amerinet's key damage expert witnesses, Mr. I. Jeff Litvak, also indicates that Amerinet was in a period of decline prior to Xerox's alleged antitrust violations and needed substantial revenues from its new and unestablished entry into the field used Xerox laser printers in order to survive.[18] Moreover, Amerinet brought suit in June, 1987, one month after the instant case was commenced, against three of its former employees for neglect of duty, defections, misappropriation of trade secrets, breach of contract, tortious interference, and unfair competition.[19] In that action, Amerinet complained that its Vice President of Sales, Louis Raiola, had conducted independent business activities in competition with Amerinet in late 1986 and early in 1987, which had interfered with Raiola's performance at Amerinet and had caused Amerinet's sales and morale to suffer substantially, in excess of $50,000, in the first quarter of 1987. Amerinet also named in that suit two other of its employees who left Amerinet with Raiola around March, 1987 to join Raiola's independent company, ProNet, claiming that those two employees misappropriated trade information and were selling in direct competition with Amerinet. Although the action Amerinet brought against Raiola and the other two employees was dismissed with prejudice, Amerinet clearly stated in its complaint in that suit that it was substantially hurt in 1986 and 1987 by factors other than Xerox's conduct. In sum, even with all reasonable inferences running in its favor, Amerinet has not distinguished its alleged antitrust injury from other evidenced injury it sustained in 1986-87, or shown the causal connection between the defendant's alleged anticompetitive violation and Amerinet's injury--a threshold burden which an antitrust plaintiff such as Amerinet bears.
 
 
 37
 Amerinet claims that it identified over 350 potential buyers of used Xerox laser printers and names 100 companies to whom it made offers. Amerinet, however, with few exceptions, has not stated, much less demonstrated, whether those prospective customers bought used Xerox laser printers from other vendors, bought new or used non-Xerox printers, or bought any printers at all. Amerinet has provided evidence of its attempted transactions with only two of those 100 companies, namely Massachusetts Mutual and New York Life Insurance Company. Amerinet contends that it lost two Massachusetts Mutual sales to Xerox, and in support of that assertion, relies upon the testimony of two Massachusetts Mutual employees, William F. Fortier and Robert J. Bologna. Mr. Fortier, who presented information with regard to Xerox's 1987 FSMA to Massachusetts Mutual employees who were responsible for making the laser printer purchase decision, testified that Xerox did not give him the impression that Xerox would treat Massachusetts Mutual unfavorably if Massachusetts Mutual bought a third-party machine.[20] Mr. Bologna, Massachusetts Mutual's Vice President in charge of operations, who was involved in the decision not to buy a used laser printer from Amerinet, also testified that Xerox did not indicate to him that it would be displeased with Massachusetts Mutual if Mutual did not buy from Xerox.[21] Mr. Bologna stated in that deposition that he recalled feeling assured that Mutual's machine, even if bought used from a third-party, would receive maintenance.[22] Mr. Bologna testified that the possible ten percent annual surcharge for maintenance of a used laser printer was "a consideration" in Massachusetts Mutual's decision not to buy from Amerinet.[23]
 
 
 38
 With regard to Amerinet's alleged lost sale to New York Life Insurance Company, Mr. John F. Hines, who summarized information for and made recommendations regarding various laser printer purchase options to New York Life, testified in his deposition that New York Life experienced "some" concern with respect to the nature of the maintenance services which would be provided by Xerox if New York Life purchased from a third party.[24] In a memo to another New York Life employee dated January 24, 1987, in which he compared prices for Xerox-sold, used, and third-party financed machines, Mr. Hines concluded that "[i]f we select any option other than a Third-Party purchase leaseback of a 9790 Xerox will probably realize that they are not in our long range plans. This point should not sway our decision, but we could see a further drop in support."[25] In a handwritten memo apparently composed about the time he authored the January 24, 1987 memo, Mr. Hines listed several factors, such as model, delivery time, available financing, length of warranty and maintenance costs, as considerations with respect to choosing between the options of purchasing a laser printer from Xerox or from a third party. In that handwritten memo, Hines wrote, "Xerox could, but it is unlikely, cancel maintenance after the first year."[26] In that same memo, Hines noted, as a factor, the possibility that the cost of buying a printer from a third party "could be higher if cluncker."[27] Amerinet's evidence concerning its dealings with Massachusetts Mutual and New York Life at the most shows that the impact of Xerox's January, 1987 supplement was one factor among many, and not a controlling or major factor, which those two companies took into account in deciding whether to purchase a used machine from Amerinet. As a result, Amerinet's only evidence of loss of specific sales fails to show that Xerox's January, 1987 maintenance policy proximately caused Amerinet to lose sales. Thus, Amerinet did not present sufficient evidence of the critical element of causation to enable it to withstand Xerox's motion for summary judgment on the ground, as noted above, that
 
 
 39
 [w]hen a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of "speculation or guesswork" not permitted for antitrust jury verdicts. Bigelow, 327 U.S. at 264, 66 S.Ct. at 579.
 
 
 40
 MCI Communications Corp., 708 F.2d at 1162.
 
 
 41
 Another merely speculative aspect of Amerinet's "proof" as to amount of damages is Amerinet's projection that it would have sold a large enough number of used Xerox laser printers, in 1987 and thereafter, to have allowed it to have stemmed the tide of its financial decline. In cases in which courts have accepted projections of sales which would have occurred absent the defendant's wrongdoing, there was evidence that the plaintiff had been selling the same product, quite often in the same geographical market, with substantial success for a significant period of time before the defendant's alleged anticompetitive conduct. See Zenith Radio Corp., 395 U.S. at 124-25, 89 S.Ct. at 1577; Bigelow, 327 U.S. at 257-58, 266, 66 S.Ct. at 576-77, 580; Story Parchment Co., 282 U.S. at 561-62, 51 S.Ct. at 250; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 376-377, 47 S.Ct. 400, 404, 71 L.Ed. 684 (1927). In some instances, therefore, the plaintiff's previous business volume and success can provide an adequate basis for its projections of future volume and profit. In this case, Amerinet had not established any business in the sale of used Xerox laser printers prior to 1987 and had at no time made any sales of those printers, other than the two test sales in 1986. Amerinet has provided, moreover, no evidence that Amerinet had any, much less significant, expertise or experience in selling any brand of laser printers or any Xerox products prior to 1987. In addition, Amerinet has not shown that its experience in reselling other products was similar and therefore transferable to the marketing of used Xerox laser printers. In that factual context, statements by Amerinet's damage expert witnesses that but for Xerox's maintenance policies, Amerinet's business, which the experts valued at anywhere between 1.4 and 4 million dollars, would not have been destroyed, cannot thwart the grant of summary judgment on Amerinet's monopoly claims, in favor of Xerox. See MCI Communications Corp., 708 F.2d at 1166.
 
 B. Tying Claim
 
 42
 Amerinet's tying claim under Section 1 of the Sherman Act[28] is that Xerox's "offer" of full service maintenance to a potential buyer of a used Xerox laser printer was, in practical effect, a refusal to sell its Full Service Maintenance Agreement, the tying product, on acceptable terms, unless the customer purchased its Xerox laser printer, the tied product, from Xerox.
 
 
 43
 "A tying arrangement is defined as the sale or lease of one item (the tying product) on the condition that the buyer or lessee purchase a second item (the tied product) from the same source." Rosebrough, 666 F.2d at 1140. See also Eastman Kodak Co., --- U.S. at ---- - ----, 112 S.Ct. at 2079-89; Northern Pacific R.R. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518-19, 2 L.Ed.2d 545 (1958); Ryko Mfg. Co. v. Eden Services, 823 F.2d 1215, 1235-36 (8th Cir.1987); Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc., 491 F.Supp. 1199, 1206-07 (D.Haw.1980), aff'd, 732 F.2d 1403 (9th Cir.1984). "[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." Northern Pacific R.R., 356 U.S. at 5-6 n. 4, 78 S.Ct. at 519 n 4. A tying arrangement is a per se violation of Section 1 of the Sherman Act and no particular showing of unreasonable anticompetitive effect is required if the plaintiff demonstrates that (1) "two distinct products" or services are involved, (2) the defendant's power in the tying product's market is capable of restraining competition "in the tied product's market," and (3) "the amount of interstate commerce in the tied product's market [is] not insubstantial." Rosebrough, 666 F.2d at 1140-41.
 
 
 44
 The Supreme Court in Jefferson Parish Hospital has made clear that a per se illegal tying arrangement does not exist unless the defendant has coerced buyers into purchasing a product which such buyers otherwise would not have purchased or would have purchased from a different source than the defendant. In that case, Justice Stevens wrote:
 
 
 45
 [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.
 
 
 46
 .... When "forcing" occurs, our cases have found the tying arrangement to be unlawful.
 
 
 47
 Thus, the law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other. When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures.
 
 
 48
 Per se condemnation--condemnation without inquiry into actual market conditions--is only appropriate if the existence of forcing is probable. Thus, application of the per se rule focuses on the probability of anticompetitive consequences. Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation. If only a single purchaser were "forced" with respect to the purchase of a tied item, the resultant impact on competition would not warrant the concern of antitrust law.... Similarly, when a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.
 
 
 49
 Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 14, 15-16, 104 S.Ct. 1551, 1559, 1560, 80 L.Ed.2d 2 (1984) (footnotes omitted). See also Robert's Waikiki U-Drive, Inc., 732 F.2d at 1407. Such a tying arrangement is regarded as inherently anticompetitive and a per se antitrust violation because it shields an inferior product from competition, excludes legitimate competitors from the market, forecloses the buying public's ability to choose products on a merit basis, and reduces competition which would otherwise bring lower prices and better quality to the marketplace. Jefferson Parish Hospital, 466 U.S. at 12-15, 104 S.Ct. at 1558-59; Rosebrough, 666 F.2d at 1140-41.
 
 
 50
 In this case, the district court concluded that Amerinet had adequately established that Xerox's laser printer and its FSMA were two separate products or services, that Xerox had sufficient market power in the field of laser printer maintenance and repair to allow it to affect the tied product market of Xerox laser printer sales, and that the sale of Xerox laser printers involved a substantial amount of interstate commerce. The district court granted summary judgment in favor of Xerox on Amerinet's tying claim, however, on the ground that the evidence failed to establish the existence of coercion or of an illegal tying arrangement.
 
 
 51
 Amerinet contends that in order for an illegal tying arrangement to exist under Jefferson Parish Hospital the buyer need not be forced to purchase an unwanted or unneeded product, but rather, need be forced only to purchase a product that he or she "might have preferred to purchase elsewhere on different terms." Amerinet asserts that the terms of Xerox's January, 1987 supplement to its FSMA precluded Xerox laser printer buyers from purchasing in the used market and forced those buyers to buy from Xerox. Amerinet maintains that an illegal tying arrangement is established by all of the evidence it presented for its monopoly claims, reviewed supra, and specifically notes Xerox's sales to Massachusetts Mutual and New York Life Insurance Company. Amerinet argues that "[t]he fact that a used printer from Amerinet was substantially less expensive than one purchased from Xerox and would operate at the same levels should have caused some customers to purchase from Amerinet if the supplement had not made it too risky and expensive."[29]
 
 
 52
 Typically, an express refusal to sell the tying product without the tied product is the basis for an illegal tying arrangement. See Jefferson Parish Hospital, 466 U.S. 2, 104 S.Ct. 1551; Northern Pacific R.R. Co., 356 U.S. 1, 78 S.Ct. 514; Rosebrough Monument Co., 666 F.2d 1130. There is some question as to whether Xerox's January, 1987 supplement to its FSMA does expressly condition the availability of its maintenance service upon the purchase of a laser printer from Xerox. Certainly, the logical result of this supplement is that availability of maintenance is not guaranteed if a Xerox laser printer is purchased second-hand or has aged a specific number of years. On the other hand, the record does not indicate that Xerox ever refused to or failed to perform requested maintenance on any Xerox laser printer, second-hand or used. Moreover, although there is evidence that Xerox did enforce the recertification and the inspection fee aspects of its supplement, the deposition testimony of Massachusetts Mutual employees, Mr. Fortier and Mr. Bologna, and the deposition testimony and corresponding memoranda of New York Life Insurance employee, Mr. Hines, do not indicate that those companies significantly feared that Xerox would refuse to service used laser printers. Indeed, Mr. Hines' own handwritten words state: "Xerox could, but it is unlikely, cancel maintenance after the first year."[30] Both Mr. Fortier and Mr. Bologna testified in their depositions that Xerox did not give them the impression that Xerox would treat Massachusetts Mutual unfavorably if Mutual bought a third-party machine.[31] Under those circumstances,[32] it appears that Xerox, through the terms of its January, 1987 supplement and its sales behavior, did not explicitly condition its maintenance service upon the purchase of a laser printer from Xerox, but rather, established different possible fee rates for the service of used as opposed to new printers.
 
 
 53
 In cases where there is no explicit agreement which conditions the purchase of the tying product upon the purchase of the tied product, an illegal arrangement may still be shown if the defendant's policy makes the purchasing of the tying and tied products together " 'the only viable economic option....' " Nobel Scientific Industries v. Beckman Instruments, Inc., 670 F.Supp. 1313, 1324 (D.Md.1986) (quoting Ways and Means, Inc. v. IVAC Corp., 506 F.Supp. 697, 701 (N.D.Cal.1979)), aff'd, 831 F.2d 537 (4th Cir.1987), cert. denied, 487 U.S. 1226, 108 S.Ct. 2886, 101 L.Ed.2d 920 (1988). Assuming that Xerox did enforce its January, 1987 supplement to the fullest extent, the purchase of a used Xerox laser printer would simply cost more, but not prohibitedly more, than the purchase of a new laser printer from Xerox. The deposition testimony and internal memoranda of prospective Xerox laser purchasers which Amerinet has submitted as evidence of coercion in no way indicates that the purchase of a used machine was considered unfeasible or was not seriously contemplated. Mr. Fortier, in fact, stated in his deposition that Massachusetts Mutual "could realistically have purchased a third-party machine under [Xerox's January, 1987 supplement] provisions."[33] Likewise, the internal memoranda prepared by Mr. Hines do not in any way suggest that the sale of a Xerox laser printer to New York Life Insurance Company was a one-horse race. In addition, as noted in Section III(A) supra, Amerinet's evidence in this case fails to indicate that Xerox's 1987 supplement to its maintenance agreement caused Amerinet to lose sales, and, accordingly, does not demonstrate that Xerox's questioned behavior created overall "higher service prices and market foreclosure." Eastman Kodak Co., --- U.S. at ----, 112 S.Ct. at 2088.
 
 
 54
 Another reason why the evidence in this case fails to demonstrate an illegal tying arrangement is that Amerinet has not shown that Xerox used Xerox's power in the maintenance market to shelter an inferior or overpriced product from competition. The record in fact suggests that the new Xerox laser printers were in high demand. Moreover, there was no evidence that those new printers, although expensive, were overpriced or prohibitedly priced. The undisputed demand for new Xerox laser printers undermines Amerinet's argument that Xerox's January, 1987 supplement coerced buyers into purchasing new Xerox laser printers. While it is true that the Court in Jefferson Parish Hospital stated that
 
 
 55
 the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms....
 
 
 56
 466 U.S. at 12, 104 S.Ct. at 1558 (emphasis added), the overall message of Jefferson is that "[t]ying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made." 466 U.S. at 27, 104 S.Ct. at 1566. As Justice Stevens further explained,
 
 
 57
 [t]hus, neither of the "market imperfections" relied upon by the Court of Appeals forces consumers to take anesthesiological services they would not select in the absence of a tie. It is safe to assume that every patient undergoing a surgical operation needs the services of an anesthesiologist; at least this record contains no evidence that the hospital "forced" any such services on unwilling patients. The record therefore does not provide a basis for applying the per se rule against tying to this arrangement.
 
 
 58
 Id. at 28-29, 104 S.Ct. at 1566-67. Moreover, in the light of the record in this case, it is by no means clear that new Xerox laser printers can be equated with used Xerox laser printers to the extent that the only difference between the two would be that the used laser printer is less expensive and therefore is the tied product "on different terms." The price differential between a new and a used laser printer, which Amerinet emphasizes, suggests otherwise. Thus, on the facts in this case, Justice Stevens' words "or might have preferred to purchase elsewhere on different terms," may not be read to wipe out the core required proof of a per se tying violation, namely, that the buyer be forced directly or indirectly to accept a deal with regard to the tied product which he or she would not otherwise have wanted.
 
 
 59
 Accordingly, Amerinet has failed to allege and adequately demonstrate, in the face of Xerox's motion for summary judgment, the existence of an illegal tying arrangement. Having so concluded, this Court need not decide in this case either whether Xerox had sufficient power in the tying product market to affect a substantial amount of trade in the tied product market, or whether the alleged tying product and tied product were separate products.
 
 IV.
 BUSINESS DISPARAGEMENT CLAIMS[34]
 
 60
 In its complaint and amended complaint, Amerinet alleges two counts of business disparagement, one under Minnesota common law and one under Minn.Stat. § 325D.44 (1988),[35] which are essentially the same. In each count, Amerinet alleges that Xerox intentionally made false and disparaging comments about Amerinet to third parties and that, as a result, Amerinet suffered lost profits and damage to its business reputation in excess of $1,000,000. Under Minnesota law "plaintiff may not recover for product disparagement unless plaintiff is able to prove special damages in the form of pecuniary loss directly attributable to defendant's false statements." Advanced Training Systems, Inc. v. Caswell Equipment Co., Inc., 352 N.W.2d 1, 7 (Minn.1984). The district court granted summary judgement against Amerinet on its business disparagement claims for failure to plead or prove the essential element of special damages. In supporting its grant of summary judgment concerning Amerinet's business disparagement claims, the district court apparently assumed that Amerinet was alleging only the loss of Xerox, not non-Xerox, product sales to a certain customer, Meijer, in connection with those claims. The district court reasoned:
 
 
 61
 It is undisputed that plaintiffs completed only one sale to Meijer Co.; that was in 1986. There is no suggestion in the record that Meijer Co. considered purchasing additional used Xerox laser printers. Plaintiffs do not explain how they could prove a "substantial decline in sales" when only one sale was made to that company over the entire time plaintiffs were engaged in business. Nor have plaintiffs presented any evidence suggesting that they lost any particular sale due to defendant's conduct. They also have not presented evidence indicating a general decline in their business "shown to be the result of defendant's disparaging statements [with] other possible causes ... eliminated." [Advanced Training Systems, Inc. v. Caswell Equipment Co., Inc. ], 352 N.W.2d at 8.
 
 
 62
 In this appeal, Amerinet argues that its business disparagement claims were based solely on the decline of its non-Xerox sales to Meijer between 1986 and 1987 and that the district court erred in granting summary judgment because the district court misunderstood the nature of Amerinet's business disparagement claims and its evidence of those claims. Amerinet contends that it provided sufficient evidence of special damages to survive summary judgment. Xerox counters with the assertion that Amerinet's theory of lost non-Xerox product sales was not properly before the district court on summary judgment. Xerox contends that Amerinet failed to assert a claim for lost non-Xerox sales to Meijer in its complaint and amended complaint, and that Amerinet's memorandum in opposition to summary judgment made no intelligibly discernible claim that alleged lost non-Xerox sales were evidence of damages. Xerox urges that the district court properly denied Amerinet's business disparagement claims for failure of pleading as well as for failure of proof.
 
 
 63
 In its amended complaint, Amerinet pleads its business disparagement claims very generally.[36] Amerinet's factual allegations with regard to its business disparagement claims in its amended complaint are also generally phrased and do not clearly allege that Amerinet lost sales of non-Xerox products due to Xerox's actions.[37] Amerinet's memorandum in opposition to summary judgment, far from clarifying its purported claims to lost non-Xerox product sales, indicates, even when read as a whole, that Amerinet was seeking damages for the loss of Xerox laser printer sales only and for the loss of its entire business as a result of those lost Xerox sales.[38] In that memorandum in opposition, Amerinet conclusorily asserts that because of Xerox's derogatory statements to Meijer personnel Amerinet did only approximately $100,000 of business with Meijer in 1987 as opposed to the $1,000,000 of business which Amerinet claims it did with Meijer in 1986 and would have done with Meijer in 1987 but for Xerox's tortious actions. Although an inference can be drawn from these allegations that Amerinet was seeking damages for lost non-Xerox product sales, Amerinet's arguments and evidence of specific damages for Xerox's alleged tortious conduct undermine that inference. The only evidence of disparagement damages which Amerinet offers in its memorandum in opposition is evidence which pertains solely to "[t]he loss of the Xerox sales opportunity [which] resulted in the cessation of Plaintiff's business operations."[39] Under those circumstances, even if Amerinet's pleadings are generously construed, Amerinet's claim for damages resulting from loss of non-Xerox product sales was not properly raised before the district court and is therefore not preserved for appeal.
 
 
 64
 But if it be assumed arguendo only, that Amerinet did properly raise below the issue of lost non-Xerox sales, Amerinet's disparagement claims do not survive summary judgment on the issue of special damages. The record contains no evidence of specific lost sales or of losses directly attributable to particular false statements by Xerox. Advanced Training Systems, Inc., 352 N.W.2d at 7. However, "[w]here plaintiff cannot show loss of specific sales, the modern view allows plaintiff to prove a general decline of business, so long as this is shown to be the result of defendant's disparaging statements and other possible causes are eliminated." Id. at 7-8. As noted in Section III(A) supra, the deposition testimony and the affidavits of Amerinet's own witnesses strongly indicate that other factors were at least in part responsible for Amerinet's general decline. In its proof of tort damages, as in its proof of antitrust damages, Amerinet made no effort to distinguish the effect of other probable causes of its business decline from the effects of Xerox's alleged tortious behavior. Also, Amerinet's pleadings, in fact, do not distinguish between the amount of damages Amerinet allegedly incurred due to antitrust violations and the amount of damages it claims that it sustained due to business disparagement. Accordingly, even under the modern rule of proof enunciated in Advanced Training Sys., Inc., Amerinet failed to provide sufficient evidence of special damages to survive summary judgment on its claims for business disparagement.
 
 V.
 TORTIOUS INTERFERENCE
 
 65
 The district court did not grant summary judgment on Amerinet's claim of tortious interference with its prospective contractual relations,[40] finding genuine issues of fact with regard to whether Xerox interfered with Amerinet's sales to such potential customers as Meijer, New York Life, and Massachusetts Mutual, by denigrating the quality of equipment supplied by Amerinet and by intentionally delaying repair to used machines.[41] Amerinet's claim of tortious interference went to trial, and the jury rendered a $1,000,000 verdict in favor of Amerinet.[42] During trial, the district court denied Xerox's motion for a directed verdict, and after trial the district court denied Xerox's motions for a new trial, for judgment notwithstanding the verdict, and/or for remittitur. Xerox appeals the district court's denial of its motions for directed verdict and j.n.o.v., claiming that the verdict should be reversed because Amerinet failed to adduce any evidence of Xerox's use of wrongful means, causation, or damages. In the alternative, Xerox maintains that the district court's failure to instruct the jury sufficiently with respect to Amerinet's burden of proof concerning the competitor's privilege and damages warrants a new trial.
 
 A. Standards of Review
 
 66
 Minnesota law and federal law enunciate similar standards for the granting of a directed verdict or a judgment notwithstanding the verdict. Johnson v. Niagra Machine & Tool Works, 666 F.2d 1223, 1225 (8th Cir.1981); Rochester Civic Theatre, Inc. v. Ramsay, 368 F.2d 748, 753 (8th Cir.1966); Wetzel v. Eaton Corp., 62 F.R.D. 22, 25-28 (D.Minn.1973). Consequently, once again, this Court need not choose between the application of a state or federal standard in this case. See Schneider v. Chrysler Motors Corp., 401 F.2d 549, 554 (8th Cir.1968); Ramsay, 368 F.2d at 753; 9 Charles A. Wright and Arthur R. Miller, Fed.Prac. and Proc. § 2525 at 550-51 (1971 & Cumm.Supp.1992). The standards for a directed verdict and a judgment notwithstanding the verdict are the same. Further, this Court reviews both issues de novo, applying the same standards as the trial court. City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 651 (8th Cir.1989); Jackson v. Prudential Insurance Co. of America, 736 F.2d 450, 452-53 (8th Cir.1984); 9 Wright and Miller, Fed.Prac. and Proc. § 2524 at 541-42. In deciding a motion for a directed verdict or for a judgment notwithstanding the verdict, the court must
 
 
 67
 (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence as viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.
 
 
 68
 Jones v. Edwards, 770 F.2d 739, 740 (8th Cir.1985) (quoting Lackawanna Leather Co. v. Martin & Stewart, Ltd., 730 F.2d 1197, 1200 (8th Cir.1984)). See also City of Omaha Employees Betterment Ass'n, 883 F.2d at 651; Northside Mercury Sales & Service, Inc. v. Ford Motor Co., 871 F.2d 758, 760 (8th Cir.1989); Pumps and Power Co. v. Southern States Industries, Inc., 787 F.2d 1252, 1258 (8th Cir.1986). " '[A] directed verdict must be granted when the non-movant's case rests solely upon speculation and conjecture lacking in probative evidentiary support.' " Johnson, 666 F.2d at 1225 (quoting Wetzel, 62 F.R.D. at 28). However, as the Supreme Court of Minnesota has written, an appellate "court will sustain a jury verdict if it is possible to do so on any reasonable theory of the evidence. It will set aside a jury verdict only if manifestly contrary to the evidence when viewed in the light most favorable to the verdict." Hughes v. Sinclair Marketing, Inc., 389 N.W.2d 194, 198 (Minn.1986) (citation omitted).
 
 B. Elements
 
 69
 With regard to the tort of interference with prospective contractual relations, Minnesota has adopted the Restatement (Second) of Torts (1979). Northside Mercury Sales & Service, Inc., 871 F.2d at 760; United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632-33 (Minn.1982). Section 766B of the Restatement (Second) of Torts sets forth the elements of an interference cause of action:
 
 
 70
 § 766B Intentional Interference with Prospective Contractual Relation
 
 
 71
 One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
 
 
 72
 (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
 
 
 73
 (b) preventing the other from acquiring or continuing the prospective relation.
 
 
 74
 Rest. (Second) of Torts § 766B. Minnesota has recognized the competitor's privilege as described in Section 768 of the Second Restatement of Torts. See United Wild Rice, Inc., 313 N.W.2d at 633.
 
 
 75
 § 768 Competition as Proper or Improper Interference
 
 
 76
 (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
 
 
 77
 (a) the relation concerns a matter involved in the competition between the actor and the other and
 
 
 78
 (b) the actor does not employ wrongful means and
 
 
 79
 (c) his action does not create or continue an unlawful restraint of trade and
 
 
 80
 (d) his purpose is at least in part to advance his interest in competing with the other.
 
 
 81
 (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.
 
 
 82
 Restatement (Second) of Torts § 768 (1979). With regard to causation, Amerinet must prove by a preponderance of the evidence that Amerinet would not have suffered its alleged losses but for Xerox's wrongful conduct. Jackson v. Reiling, 311 Minn. 562, 249 N.W.2d 896, 897 (1977); North Central Co. v. Phelps Aero, Inc., 272 Minn. 413, 139 N.W.2d 258, 263 (1965). Amerinet cannot recover for damages which are "remote, conjectural, or speculative," but rather, must demonstrate by a fair preponderance of the evidence that its alleged losses were reasonably certain to occur. Carpenter v. Nelson, 257 Minn. 424, 101 N.W.2d 918, 921 (1960). See also Jackson, 249 N.W.2d at 897.
 
 C. Competitor's Privilege
 
 83
 Xerox claims that it did not interfere improperly with Amerinet's business relations because its actions fell within the competitor's exception. Xerox argues that that exception applies because (1) Amerinet and Xerox are in a competitive relationship with regard to the subject, (2) Xerox did not employ wrongful means in competing with Amerinet, (3) the district court's grant of summary judgment on Amerinet's antitrust claims precludes a finding that Xerox unlawfully restrained trade with regard to Amerinet, and (4) Xerox's actions toward Amerinet were at least in part aimed at advancing Xerox's own business interests. Xerox emphasizes that on summary judgment Amerinet failed to demonstrate that Xerox's maintenance policies were illegal and that evidence of Xerox's maintenance policies were introduced at trial under an instruction from the district court limiting their relevance to the issue of intent only. In the alternative, Xerox argues that even if the district court had not limited the purposes for which evidence of Xerox's maintenance policies could be considered by the jury, Amerinet still failed to present any evidence at trial that Xerox acted outside the scope of the competitor's privilege.
 
 
 84
 In response, Amerinet, while agreeing that it had to show that Xerox's actions were outside of the competitor's privilege and that it had to demonstrate Xerox's use of wrongful means, asserts that its case at trial was based upon Xerox's interference with Amerinet's prospective sales of non-Xerox products to Meijer and Xerox's interference with sales of used Xerox laser printers to prospective customers. Amerinet maintains, moreover, that it presented at trial sufficient evidence of Xerox's use of wrongful means because that evidence demonstrated that Xerox committed breach of contract, misrepresentation, and fraud through Xerox's involvement with the transaction between Amerinet and Meijer and that Xerox's conduct was anticompetitive. Specifically, Amerinet maintains that by failing to ship the parts ordered for the Meijer machine within a reasonable time, Xerox breached an oral contract with Amerinet concerning the supply of such items. Amerinet contends that the jury's consideration of Xerox's representations that the Meijer machine was in poor condition after it had been inspected and certified by Xerox, and of Xerox's billing of Meijer for $27,000 for repairs of that machine, could have led the jury to find that Xerox committed misrepresentation and outright fraud. Amerinet argues that the jury could reasonably have concluded that Xerox's adoption and use of its January, 1987 supplement was anticompetitive, misleading as to the quality of used machines, and wrongful. In particular, Amerinet points to Xerox's use of its January, 1987 supplement in the New York Life and Massachusetts Mutual matters, claiming that the analyses prepared by Xerox for those companies comparing maintenance costs of new versus used laser printers misleadingly implied that used machines were in poor or doubtful condition even though almost all such used machines had been under full service maintenance by Xerox.
 
 
 85
 In essence, Amerinet asserts that the competitor's privilege does not apply to Xerox's actions because they were wrongful within the meaning of Section 768(b) of the Restatement.[43] Amerinet had the burden of introducing evidence to prove that Xerox's conduct was beyond the scope of the competitor's privilege. See James M. King & Assoc., Inc. v. G.D. Van Wagenen Co., 717 F.Supp. 667, 669-80 (D.Minn.1989) (interpreting Minnesota law on tortious interference). "[W]rongful means," as those words are used in Restatement Section 768(b), "refer[ ] to means which are intrinsically wrongful--that is, conduct which is itself capable of forming the basis for liability of the actor." Conoco, Inc. v. Inman Oil Co., 774 F.2d 895, 907 (8th Cir.1985) (interpreting Missouri law), cited with approval by H.J., Inc. v. International Telephone & Telegraph Corp., 867 F.2d 1531, 1548 (8th Cir.1989) (interpreting Minnesota law), rehearing denied, 876 F.2d 59 (8th Cir.1989). See also Briner Electric Co. v. Sachs Electric Co., 680 S.W.2d 737, 741 (Mo.App.1984) ("[C]ompetitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations.")
 
 
 86
 Amerinet has alleged that Xerox committed breach of contract, misrepresentation, and fraud, in the Meijer matter or in other matters. However, the record below and the briefs and oral argument submitted by Amerinet in this appeal indicate little if any support for those claims. Indeed, in this appeal, the only trial evidence to which Amerinet points to demonstrate the existence and the breach of an oral contract between itself and Xerox for the delivery of parts to Meijer within a specific time-frame was the testimony of Mr. Brandsey, Amerinet's President, that "it was our understanding that the normal time for delivery is two to four weeks.... And it took us almost 90 days, I understand, just about 90 days, to get the parts delivered to us...."[44] That statement simply does not form the basis for a reasonable inference that Xerox had entered into, much less breached, a contract with Amerinet for the delivery of parts by a certain date and does not show misrepresentation or fraud.
 
 
 87
 To maintain a claim for fraud or intentional misrepresentation, a plaintiff must demonstrate that the defendant not only knowingly made "a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it," Restatement (Second) of Torts § 525, but also that the receiver of the misrepresentation suffered pecuniary loss substantially because of his or her justifiable reliance upon that misrepresentation. See Restatement (Second) of Torts § 546 (1979). Assuming arguendo that Amerinet did present sufficient evidence at trial to support a reasonable inference by the jury that Xerox knowingly made material misrepresentations of fact with regard to the quality of Amerinet's products to Meijer, New York Life Insurance Company and/or Massachusetts Mutual in the course of Xerox's dealings with one or more of those companies, Amerinet has still failed to present any evidence that any of those companies relied, justifiably or otherwise, upon Xerox's statements or any evidence of how Amerinet suffered any specific pecuniary loss because of such reliance. Further, Amerinet offered no evidence that any of those companies were dissatisfied with Xerox's products or maintenance services.
 
 
 88
 Although Amerinet maintains that Xerox's billing of Meijer for $27,000 worth of upgrades and repairs constituted fraud because the Meijer machine had already been repaired and certified for maintenance by Xerox personnel at another location, there is no evidence in the record that Meijer was dissatisfied with or complained about Xerox's repairs or repair fees.[45]
 
 
 89
 Accordingly, this Court concludes that Amerinet did not adduce sufficient evidence at trial to allow a reasonable jury to find that Xerox used wrongful means and thus acted outside the scope of the competitor's privilege. Therefore, Xerox's motion for a directed verdict could justifiably have been granted and its motion for a judgment notwithstanding the verdict should have been granted by the trial court with respect to Amerinet's state law tortious interference claim. For that reason alone, this Court will remand this case to the trial court with direction to enter such judgment in favor of Xerox. However, there is an additional reason why such a result is required. See Section V(E) infra.
 
 D. Causation
 
 90
 At trial, Amerinet had the burden of proving by a preponderance of the evidence that Amerinet would not have suffered its alleged losses but for Xerox's wrongful conduct. Jackson, 249 N.W.2d at 897; Phelps Aero, Inc., 139 N.W.2d at 263. Amerinet presented what may be characterized as two types of causation/damages arguments to the jury: (1) Xerox's affirmative use of its January, 1987 supplement to its FSMA interfered with Amerinet's prospective Xerox laser printer sales and thereby caused the destruction of Amerinet's entire business, and (2) Xerox's conduct in relation to the Meijer sale caused Amerinet to lose Amerinet's preferred vendor status with Meijer and consequently to lose $1,000,000 worth of business with Meijer in 1987.
 
 
 91
 As to Amerinet's former claim, it must be noted, first, that under the district court's limiting instruction, any evidence with regard to Xerox's January, 1987 supplement went to the issue of intent only, not causation or damages. However, assuming arguendo that the jury could properly have considered evidence of Xerox's use of that supplement with regard to causation and damages, Amerinet provided essentially the same type of evidence at trial as it did in opposition to summary judgment. It is true that at trial Amerinet offered additional expert testimony that Xerox's use of its January, 1987 supplement caused the end of the resale market for Xerox laser printers. However, Amerinet failed at trial, as it did on summary judgment, to differentiate any losses which Amerinet allegedly suffered from Xerox's use of that supplement from other probable causes for its decline. As this Court noted in its review of Amerinet's evidence in connection with Xerox's motion for summary judgment in Section III(A) supra, the testimony of Amerinet's own experts clearly implied that Amerinet had been in decline since at least 1985 due to substantially decreasing profit margins with regard to the products which it sold. Moreover, it was uncontroverted at trial that Amerinet had filed suit against its Vice President of Sales and two other employees for neglect of duty, defection, misappropriation of trade secrets, breach of contract, tortious interference and unfair competition. There was also substantial evidence at trial that prior to the first half of 1987, Amerinet had claimed that it had lost between $55,000 and $100,000 in profits due to one of its suppliers's failure to perform. In the face of such evidence of other causes for Amerinet's decline, Amerinet offered only the bald assertions of its expert witnesses that but for Xerox's use of its 1987 supplement Amerinet would not have gone out of business. Nor does Amerinet's reliance upon the deposition testimony, read at trial, of Mr. Bologna and of Mr. Fortier support the reasonable inference that but for Xerox's January, 1987 supplement, Amerinet would have sold a used laser printer to Massachusetts Mutual, much less enough used laser printers to keep Amerinet in business. Rather, the deposition testimony of those persons indicates that Xerox's 1987 maintenance policy was but one factor of many which influenced Massachusetts Mutual's decision not to buy a used laser printer and does not support a finding that Xerox's maintenance policy was a dispositive factor in Mutual's decision. See Section III(A) supra. In that context, there was insufficient evidence to enable the jury reasonably to find that but for Xerox's allegedly tortious actions Amerinet would not have gone out of business.
 
 
 92
 The question of whether Amerinet provided enough evidence with regard to causation to thwart a directed verdict with respect to its claim that Xerox's actions caused Amerinet to lose $1,000,000 worth of non-Xerox sales to Meijer in 1987 is a closer one. At trial, it was undisputed that Amerinet had maintained a business relationship with Meijer since 1980 or 1981, that in 1986 or before Amerinet had a preferred vendor status with Meijer, that Amerinet did approximately $1,000,000 worth of business with Meijer in 1986, and that in 1987 Amerinet lost its preferred vendor status and did only $66,000 worth of business with Meijer. Preferred vendor status meant that Meijer gave Amerinet the opportunity to bid on any of Meijer's requirements and bought from Amerinet if Amerinet's prices were competitive with other bids or prospective bids. From the record on appeal, it appears that Amerinet provided sufficient evidence to the jury to enable the jury reasonably to have concluded the following:
 
 
 93
 (1) In June of 1986, Amerinet offered to sell Meijer a used Xerox laser printer for $295,000.
 
 
 94
 (2) At that same time, Xerox offered to sell Meijer the laser printer Xerox which had been leasing to Meijer for $345,000.
 
 
 95
 (3) Upon learning of Amerinet's offer, Xerox disparaged the quality of used equipment and threatened for a while not to supply maintenance for the machine Amerinet was offering, but then offered maintenance for that machine at a rate higher than that offered for a machine bought from Xerox.
 
 
 96
 (4) Because of those statements and actions by Xerox, Amerinet was forced to sell Meijer a printer at a reduced price of $268,000.
 
 
 97
 (5) After Amerinet completed its sale to Meijer, Xerox delayed in installing the printer at Meijer's location and in delivering the parts and upgrades ordered for the Meijer machine.
 
 
 98
 (6) After the machine was installed and certified, Xerox personnel advised Meijer that the machine was in poor condition and that a used machine would not perform to the level of a machine bought directly from Xerox, and performed $27,000 worth of repairs, in part at least, needlessly, for which Meijer was billed.
 
 
 99
 (7) In a letter, Meijer complained to Amerinet that it was concerned about the performance of the machine which it had bought from Amerinet and told Amerinet that it felt that Amerinet was responsible for its concerns.
 
 
 100
 (8) Meijer blamed Amerinet for all of the problems which, in fact, Xerox caused Meijer in the upgrading and installation of Meijer's machine.
 
 
 101
 However, giving Amerinet the benefit of all of those factual findings, there remains conspicuously absent any evidence linking any specific Meijer business losses of Amerinet concerning non-Xerox or Xerox products to any particular acts of Xerox employees, and any testimony from any Meijer personnel. The one letter from Meijer which Amerinet produced at trial spoke only to its Xerox laser printer transaction, not any non-Xerox product transactions, and was extremely vague about what displeased Meijer about that transaction. Very possibly, Amerinet's own actions independent of Xerox's allegedly wrongful actions may have provoked that letter from Meijer. At best, the above-noted evidence supports only a very weak inference that Xerox's allegedly tortious behavior made Amerinet lose its preferred vendor status with Meijer. That inference, however, is extremely tenuous particularly in the light of the fact that Amerinet produced no evidence at trial that Meijer bought any equipment from anyone in 1987.
 
 
 102
 In sum, this Court has considerable doubt as to whether Amerinet presented sufficient evidence at trial to support a jury finding that Xerox's allegedly tortious behavior caused Amerinet to go out of business or to lose $1,000,000 worth of non-Xerox sales to Meijer. But in view of this Court's conclusion as set forth supra in Part V(C) and infra in Part V(E) of this opinion, this Court need not resolve that issue upon this appeal.
 
 E. Damages
 
 103
 Amerinet claims that there was sufficient evidence at trial to support the jury's $1,000,000 verdict in its favor on the basis of either its destruction of business theory or lost non-Xerox product sales theory. With respect to its destruction of business theory, the only evidence which Amerinet produced at trial was expert testimony, principally that of Mr. Litvak. The latter projected that if Xerox had not interfered with Amerinet's prospective sales of used Xerox laser printers,[46] Amerinet would have sold approximately eight million dollars worth of used laser Xerox printers in 1987, approximately seven and one-half million dollars worth of those printers in 1988, and approximately six million dollars worth in the years 1989, 1990, 1991, and 1992. From the revenues generated from those sales, Mr. Litvak predicted that Amerinet would have then been able to stem whatever decline Amerinet was experiencing and then successfully enter a profitable new "VAR" business, becoming Value Added Remarketers of I.B.M. equipment. Upon cross-examination of Mr. Litvak, Xerox adduced that Mr. Litvak's testimony meant that Amerinet's sales of Xerox laser printers would have increased from $433,000 in 1986 to $8,250,000 in 1987, thereby exceeding in one year Amerinet's total revenue from all sources during its prior seven-year existence.
 
 
 104
 Aside from the fact that Mr. Litvak's projections have a fairy-tale-like tone to them, those projections are clearly mere speculation because they assume not only that Amerinet would produce profits from two new businesses, but tremendous profits from those new businesses. Moreover, it is well to keep in mind that Mr. Litvak himself testified that Amerinet was not a "stellar entity" and that Amerinet presented no evidence that it had established any significant business or expertise in either the field of VAR or of used Xerox laser printers. The Supreme Court of Minnesota has stated that, generally, "proof of loss of profits in a new business is too speculative to be the basis for recovery" in tort. Village of Elbow Lake v. Otter Tail Power Co., 281 Minn. 43, 160 N.W.2d 571, 574 (1968). The rationale for "[t]his general rule derives from the fact that, lacking a history of profits, new businesses rarely have evidence upon which an award of damages may be based with the requisite degree of certainty." Leoni v. Bemis Co., 255 N.W.2d 824, 826 (Minn.1977). Consistent with that principle, the Minnesota Supreme Court has more recently written:
 
 
 105
 We have adopted no per se rule that only an "established business" can recover damages for loss of prospective profits. The controlling principle governing actions for damages is that "damages which are speculative, remote, or conjectural are not recoverable." ... Once the fact of loss has been shown, the difficulty in proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount.
 
 
 106
 Id. (citations omitted). See also Olson, Clough & Straumann, CPA's v. Trayne Properties, Inc., 392 N.W.2d 2, 4-5 (Minn.App.1986); Vault, Inc. v. Michael-Northwestern Partnership, 372 N.W.2d 7, 8-9 (Minn.App.1985); Olson v. Aretz, 346 N.W.2d 178, 182-83 (Minn.App.1984). Thus, while not impossible to meet, "the burden of proof of lost profits is particularly heavy in the case of a new business." Unique Systems, Inc. v. Zotos International, Inc., 622 F.2d 373, 378 (8th Cir.1980) (interpreting Minnesota law). Amerinet has provided no concrete evidence which would form the basis for a reasonably based factual conclusion that Amerinet could have achieved even close to the total of profits which it asserts it would have attained in the sale of used laser printers and/or the VAR business. Indeed, on the record in this case there is no basis for more than pure speculation as to what level of profits Amerinet could have achieved, if Xerox had not allegedly interfered with Amerinet's business.
 
 
 107
 Amerinet's claim that it would have sold $1,000,000 worth of business to Meijer in 1987 absent Xerox's alleged interference fares no better. While Amerinet presented evidence that it had an established business with Meijer and had done approximately $1,000,000 worth of business with Meijer in 1986, there is no clear indication in the record, as indicated in Section V(D) infra, that that $1,000,000 of business with Meijer was reasonably certain to occur in 1987 absent wrongful interference by Xerox.
 
 F. Conclusion
 
 108
 Therefore, for the reasons stated in Parts V(C) and (E) of this Opinion, this Court concludes that the district court should have granted Xerox's motion for a judgment notwithstanding the verdict because Amerinet did not provide sufficient evidence for a reasonable juror to find that Xerox had used wrongful means and was outside the scope of the competitor's privilege, and also because Amerinet failed to meet its burden to show damages.[47]
 
 VI.
 DISPOSITION
 
 109
 The judgment of the district court is affirmed in each and every respect except that the district court's denial of Xerox's motion for judgment notwithstanding the verdict with regard to Amerinet's state law tortious interference claim is hereby reversed and this case is hereby remanded to the district court with direction to enter judgment for Xerox in connection with that claim.
 
 
 110
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 
 *
 The HONORABLE FRANK A. KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation
 
 
 [1]
 Amerinet is apparently a successor to Genesis and Kaibab National Group, Inc., d/b/a Genesis Systems Corporation
 
 
 [2]
 The district court permitted Amerinet in September, 1988 to amend its complaint to include a tying claim under 15 U.S.C. § 1
 
 
 [3]
 15 U.S.C. §§ 1, 2 (1975)
 
 
 [4]
 At trial, Amerinet renewed its motion for punitive damages which the trial court denied a second time on February 7, 1991
 
 
 [5]
 The district court deemed Amerinet's unfair competition claim to be identical to Amerinet's tortious interference claim
 
 
 [6]
 Trial was commenced before the Honorable Diana E. Murphy, District Judge, District of Minnesota, Fourth Division, in November, 1989. After six days of trial, Judge Murphy adjourned the trial in order to proceed with criminal cases because of the time requirements of the Speedy Trial Act, 18 U.S.C. §§ 3161-3174 (1974). In view of Judge Murphy's continuing time constraints, she suggested, and the parties agreed, that the Honorable Bruce Van Sickle, District Judge, District of North Dakota, sitting by special designation, preside over the remainder of the trial. Trial was not resumed until January, 1991. Following conclusion of trial, judgment was entered on February 25, 1991 by Judge Van Sickle
 
 
 [7]
 During trial, Amerinet withdrew its defamation claim
 
 
 [8]
 The record reveals that the facts set forth in Part I of this opinion are not disputed
 
 
 [9]
 Xerox, as is commonly done in the laser printer industry, advertises printers with remanufactured parts as "new." Herein, as in the trade, new or newly-remanufactured printers sold by Xerox are referred to as "new" and printers which have been in service but have not been remanufactured are referred to as "used." Remanufacturing includes refurbishing and upgrading a used machine
 
 
 [10]
 The list price of those printers without special attachments and/or features was approximately $400,000 in 1987
 
 
 [11]
 Xerox claims that when its laser printers were first introduced into the market in 1978, assured availability was not at issue because at that time most of those printers were leased from Xerox and Xerox required that those machines be maintained under Xerox's FMSA. Plaintiffs claim that the industry practice is to provide service until manufacture of the product is discontinued and that Xerox's new maintenance policy was contrary to that industry practice and was designed to discourage the sale of used machines
 
 
 [12]
 The January, 1987 supplement with regard to Xerox's FMSA states in pertinent part:
 
 
 [12]
 ASSURED PERIOD OF FULL SERVICE MAINTENANCE (FSM) COVERAGE
 A. For Equipment purchased by the Customer from Xerox as Newly Manufactured or Remanufactured, FSM shall be available for seven (7) years from the Original Equipment Warranty expiration date.
 B. For Equipment installed under a Xerox Order Agreement for Term Lease, FSM shall be available for seven (7) Years from the Term Lease Commencement Date. If the Equipment was installed under a Xerox Order Agreement for Equipment Services prior to the Term Lease Agreement, FSM shall be available for FIVE (5) YEARS from Term Lease Commencement Date.
 C. If FSM pertains to Equipment previously installed under a Xerox Order Agreement for Equipment Services and Customer subsequently exercises its option to purchase, FSM shall be available for FIVE (5) YEARS from the date Xerox transferred title to the Equipment.
 D. For Equipment Upgrade(s), FSM shall be available for SEVEN (7) YEARS from the original equipment installation date except in the case of 9700 upgrades to 9790 in which case FSM shall be available for FIVE (5) YEARS from the upgrade conversion date.
 E. Upon expiration of assured FSM, Xerox will inspect the Equipment at Xerox' then published rates. The owner will receive a written estimate of charges to maintain FSM for the next twelve (12) month period. Charges will be billed at current time and materials rates. Xerox reserves the right to continue or cancel FSM on a year to year basis.
 F. Upon expiration of assured FSM, Xerox reserves the right to assess a service escalator, not to exceed ten percent (10%) of the annual FSM charge, per year.
 G. The period of assured FSM availability shall remain with the original title holder of the Equipment and is not transferable with the transfer of title. Any attempted transfer of assured FSM shall cause the period of assured FSM to expire.
 Complaint (filed May 13, 1987) at Exhibit B.
 
 
 [13]
 Tisdale v. Dobbs, 807 F.2d 734, 740 (8th Cir.1986); Voutour v. Vitale, 761 F.2d 812, 817 (1st Cir.1985), cert. denied sub nom. Town of Saugus v. Voutour, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); Kriegesmann v. Barry-Wehmiller Co., 739 F.2d 357, 358 (8th Cir.1984); Ingalls Iron Workes Co. v. Fruehauf Corp., 518 F.2d 966, 967 (5th Cir.1975); Marion County Cooperative Ass'n v. Carnation Co., 214 F.2d 557, 562 (8th Cir.1954)
 
 
 [14]
 15 U.S.C. § 2 (1975) states:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
 
 
 [15]
 Amerinet also offers, as evidence of causation and injury, the deposition statement of Mr. Plata, one of Amerinet's expert witnesses in the electronic printing and computer brokerage industry and a chief executive of a firm which upgrades Xerox laser printers, that Mr. Goins, a Xerox representative, informed him that "they (Xerox) intended to take over the third-party marketplace, themselves, that they would become aggressive in the--in the pricing of new and used equipment in order to control both the new and the used printer marketplace directly through Xerox." Such a statement goes to the issue of intent only and does not demonstrate that Amerinet was injured by Xerox's allegedly wrongful designs or that any decline in business which Amerinet experienced in fact occurred because of any alleged wrongful actions of Xerox
 
 
 [16]
 Pacey Affidavit, letter attachment (dated January 6, 1989) at 4
 
 
 [17]
 Amerinet's Opposition Memorandum to Defendant's Motion for Summary Judgment at 27
 
 
 [18]
 Litvak's deposition testimony was, in part:
 Q: Now, is it your opinion that it was the inability to market the Xerox machine alone and with no other contributing factor was the sole cause of AmeriNet going out of business?
 A: Correct. I believe they would have survived--
 Q: There were no other--
 A: Yes, sir. I believe they would have survived but for the actions of Xerox. I believe that there would have been significant gross margin on those Xerox laser printer sales that would have enabled this entity to survive but for the actions of Xerox assuming liability on the part of Xerox.
 Q: Well, you said they would have survived. Were there any other adverse circumstances that impacted AmeriNet during this time period?
 A: I take issue with the term adverse. I have considered other factors, and I'd be happy to discuss those.
 ....
 A: ... So while they were not a stellar entity, they were in adequate enough financial position prior to the breach that with the additional cash flows from the Xerox laser printer market they would have been able to penetrate the VAR market, the systems integration market, and also do what they had done in the past as far as the sale of IBM and other peripheral equipment.
 So I guess my conclusion is that they would have survived with the cash flows from the Xerox laser printer market because they were significant....
 Litvak Depo. at 94-95.
 
 
 [19]
 Significantly, the three deserting employees which Amerinet sued were apparently three of the four employees who Amerinet assigned to market used Xerox laser printers in the fall of 1986. See Plaintiffs' Answers and Supplemental Answers to Xerox Interrog. No. 4 (First Set)
 
 
 [20]
 Mr. Fortier, in his deposition, stated:
 Q: Did at any time Xerox ever give you any impression that unfavorable results would result or would occur if you bought a third-party machine--if Massachusetts Mutual bought a third-party machine?
 A: I personally didn't get that impression; no.
 Fortier Depo. at 68.
 
 
 [21]
 Appellant's Appendix at 1049
 
 
 [22]
 Id. at 1048
 
 
 [23]
 Mr. Bologna stated:
 Q: Sure. But the ten percent surcharge cost for Scenario D for five years is how much money?
 A: A hundred eighty-five thousand one hundred forty-eight dollars.
 Q: Let me ask you. In your decision-making process, is there a significant sum to determine whether you would want to buy a third-party machine or not?
 A: It's obviously a consideration.
 ....
 Q: Did you take into account or did your people take into account any of the provisions of E, F, and G [of Xerox's 1987 FSMA supplement] for the purposes of making your decision?
 ....
 THE WITNESS: The escalation clause that was in there was a consideration.
 Bologna Depo. at 29-30, 36.
 
 
 [24]
 Mr. Hines stated:
 Q: Mr. Hines, did the presentation of the provisions of the January 1 supplement that's referenced by Hines Exhibit 7, and I believe also by Hines Exhibit 8, give New York Life some concern with respect to the nature of the maintenance services that was going to be provided by Xerox if you purchased a third-party machine?
 A: Some.
 Hines Depo. at 23.
 
 
 [25]
 Hines Depo. Exh. 9 (emphasis added)
 
 
 [26]
 Hines Depo. Exh. 10 at 1
 
 
 [27]
 Id. at 2
 
 
 [28]
 15 U.S.C. Sec. 1 (1975) states:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
 
 
 [29]
 Appellees'/Cross Appellants' Brief at 36
 
 
 [30]
 Hines Depo. Exh. 10 at 1
 
 
 [31]
 Fortier Depo. at 68; Appellant's Appendix at 1049
 
 
 [32]
 Those circumstances factually distinguish this case from Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55, 65-66 (4th Cir.1969), in which the defendant's policy and its enforcement of that policy were coercive
 
 
 [33]
 Appellate Appendix at 1046-47
 
 
 [34]
 The district court properly exercised diversity jurisdiction over Amerinet's state law claims
 
 
 [35]
 Minn.Stat. Sec. 325D.44 states in pertinent part:
 Subdivision 1. A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
 ....
 (8) disparages the goods, services, or business of another by false or misleading representation of fact.
 Minn.Stat. Sec. 325D.44 (West 1988). See Advanced Training Systems, Inc. v. Caswell Equipment Co., Inc., 352 N.W.2d 1, 4 (Minn.1984).
 
 
 [36]
 Amerinet's amended complaint states:
 
 
 [43]
 To the best information and belief of Plaintiff, Xerox has continued to make false and disparaging statements to third parties about Genesis and Amerinet
 
 
 [44]
 As a proximate result of Xerox's unlawful and tortious statements, Plaintiff has suffered damages to its business reputation in an amount to be determined in excess of $1,000,000.00
 
 
 [45]
 As a proximate result of Xerox's unlawful and tortious statements, Plaintiff has lost profits in an amount to be determined in excess of $1,000,000.00
 Amended Complaint pp 43-45.
 
 
 [37]
 The following is the only instance in which Amerinet arguably refers to its alleged loss of non-Xerox product business:
 [T]he Xerox personnel in Michigan proceeded to Meijer's location and after calling in several of Meijer's management personnel, pulled off the cabinetry of the unit and made disparaging and untruthful statements regarding Genesis and Genesis' equipment for the purpose of denigrating the business of Genesis and the products sold by Genesis.... The only purpose for Xerox's delay in installation and disparaging remarks would be to damage the business reputation of Genesis and to interfere with the business relationship between Meijer and Plaintiff in order to prevent any further possible transactions and to induce a breach of the existing contract if possible.
 Amended Complaint p 19.
 
 
 [38]
 In its memorandum in opposition to summary judgment, Amerinet argued, inter alia, for its business disparagement claims in the following terms:
 In the Meijer matter, Defendant made specific statements designed to call into question the value of the Xerox Laser Printer that Plaintiff was attempting to sell to Meijer. Specifically Defendant's sales and service representatives told Meijer that Plaintiff's equipment may not be eligible for full service maintenance. Defendant further implied that Plaintiff's equipment, after being placed under FSM, would still not operate at the same level as the Defendant's existing printer. Each of these statements was false and Defendant either knew or should have known that they were false.
 Defendant's statements damaged Plaintiff's reputation with its long-time customer resulting in a substantial direct loss of sales. In 1986, Plaintiff did approximately $1,000,000.00 in business with Meijer. In 1987 Plaintiff did only $100,000.00 in business directly as a result of the damage to its relationship from Defendant's derogatory statements.
 Amerinet's Memorandum in Opposition at 70-71.
 
 
 [39]
 Memorandum in Opposition at 74
 
 
 [40]
 In its complaint and amended complaint, Amerinet alleged interference with prospective business advantage and unfair competition. The district court deemed Amerinet's unfair competition claim a claim of tortious interference on the facts of this case because in Minnesota unfair competition is not itself an actionable tort, but rather, describes two specific business torts which are actionable, i.e. tortious interference with contractual relationships and improper use of trade secrets. The district court also treated Amerinet's claim of interference with prospective business advantage and its claim of interference with contractual relationships as stating the same claim. No party has challenged the district court's characterization of Amerinet's unfair competition claim as a claim for tortious interference or that court's equation of that claim with Amerinet's claim of interference with prospective business advantage
 
 
 [41]
 Xerox has not challenged in this appeal the district court's denial of summary judgment on Amerinet's claim of tortious interference
 
 
 [42]
 The district court also denied summary judgment on Amerinet's defamation claim. However, at the close of its case in chief, Amerinet withdrew its defamation claim and no issues pertaining to that claim have been raised in this appeal by either side
 
 
 [43]
 To the extent that Amerinet is contending in this appeal that Xerox's conduct constituted an unlawful restraint of trade within the meaning of Section 768(c), this Court disagrees, noting its affirmance supra in this opinion of the district court's grant of summary judgment against Amerinet with respect to the latter's antitrust claims. Amerinet has not shown how Xerox's actions violated any other federal or state statutory or common law anticompetitive prohibition
 
 
 [44]
 Appellant's Appendix at 787
 
 
 [45]
 The only evidence of Meijer's alleged discontent with Xerox that Amerinet identifies on appeal is the trial testimony of Mr. Brandsey that he received a letter from Meijer "indicating that [it] was very concerned about the performance of the Xerox machine that we had shipped in December of 1986 and felt that, quite frankly, Amerinet was to blame for this, and tried to indicate to us that we were totally at fault." Supplemental Appendix of Appellees at 92. Ironically, Mr. Brandsey's statement indicates that Meijer was, if anything, unhappy with Amerinet's performance, not Xerox's. This is especially true in view of the evidence introduced by Amerinet at trial, that the Meijer printer, only two months after being repaired and installed, was operating at optimal capacity
 
 
 [46]
 Amerinet's destruction of business damage theory is apparently premised upon the allegation that Xerox's maintenance policy caused Amerinet to lose sales of used Xerox laser printers. Amerinet has not challenged on appeal, however, the district court's limiting instruction that the jury was to regard evidence concerning Xerox's maintenance policies solely as evidence with respect to the issue of intent. Thus, Amerinet's destruction of business theory of damages appears prima facie untenable in the light of the district court's said limiting instruction. This Court's discussion of the sufficiency of evidence of Amerinet's destruction of business damages proceeds upon the assumption, arguendo only, that Amerinet may point to evidence about Amerinet's alleged loss of sales of used Xerox laser printers in order to show that Amerinet produced evidence at trial of damages sufficient to survive a directed verdict or a judgment notwithstanding the verdict
 
 
 [47]
 In light of this opinion, all issues pertaining to Amerinet's quest for prejudgment interest and punitive damages, and Xerox's motion for a new trial have become moot