# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-1416/1850/2168/2169

_____

Minnesota Supply Company,          *
a Minnesota Corporation,           *
                                   *
    Plaintiff-Appellee/            *
    Cross-Appellant,               *    Appeal from the United States
                                   *    District Court for the
    v.                             *    District of Minnesota.
                                   *
The Raymond Corporation, a         *
New York Corporation,              *
                                   *
    Defendant-Appellant/           *
    Cross-Appellee.                *

_____

Submitted: February 14, 2005
Filed: December 28, 2006

_____

Before ARNOLD, BOWMAN, and GRUENDER, Circuit Judges.

_____

BOWMAN, Circuit Judge.

In this diversity action, a jury returned a verdict in favor of Minnesota Supply Company (MN Supply) against The Raymond Corporation (Raymond) on three claims arising under the Minnesota Heavy and Utility Equipment Manufacturers and Dealers Act (HUEMDA), Minn. Stat. §§ 325E.068–325E.0684, and awarded MN Supply over $14 million in damages. The District Court entered judgment for MN Supply but reduced the damages award. The court then awarded MN Supply attorney

fees and actual costs, but in an amount less than that requested by MN Supply. Raymond appeals, raising several allegations of error. MN Supply cross-appeals the reduction of damages and the amount of costs awarded. We affirm in part, reverse in part, and remand the case to the District Court for a new calculation of attorney fees and costs to be awarded MN Supply.

I.

Raymond and MN Supply entered into a dealership agreement in 1947 whereby MN Supply would act as a dealership for lift trucks, i.e., forklifts, manufactured by Raymond. MN Supply was located in Eden Prairie, Minnesota, and its territory under the dealership agreement included Minnesota, North Dakota, South Dakota, and the western counties of Wisconsin. MN Supply sold only lift trucks manufactured by Raymond until 1989, when MN Supply also began selling lift trucks manufactured by Caterpillar. These Caterpillar lift trucks were designed and classified differently from the Raymond lift trucks and because of market conditions and customer preferences, generally did not compete with the Raymond lift trucks.

Also in 1989, the Minnesota legislature passed HUEMDA. HUEMDA specified that a heavy-equipment manufacturer must have good cause to terminate, cancel, or fail to renew a dealership agreement or to change the competitive circumstances of the agreement. The statute gave examples of what would constitute such good cause and specified certain actions that would amount to violations of HUEMDA. In particular, HUEMDA made it a violation for a manufacturer to "coerce an equipment dealer into a refusal to purchase the equipment manufactured by another equipment manufacturer." Id. § 325E.0682(b)(2). HUEMDA also gave equipment dealers the right to seek damages from or an injunction against manufacturers for any violation of the statute. Id. § 325E.0684.

In 1990, MN Supply and Raymond updated their dealership agreement. One provision (Paragraph 18) of the updated agreement gave Raymond the right to terminate the agreement if MN Supply sold lift trucks that competed directly with Raymond lift trucks without first obtaining Raymond's written consent. Again, the Caterpillar trucks sold by MN Supply at the time were considered noncompeting because of their different design and target customer. In 1992, however, Raymond began producing narrow-aisle lift trucks for Caterpillar that did compete directly with the Raymond brand of lift trucks.[1] MN Supply elected to sell the new Caterpillar narrow-aisle lift trucks even though Raymond asserted that doing so would run afoul of Paragraph 18.

Raymond was concerned about MN Supply's diversion of time and attention from representing Raymond lift trucks, and Raymond wanted to ensure that MN Supply would maintain Raymond's market share in MN Supply's territory. For this reason, Raymond negotiated changes to the dealership agreement before giving MN Supply consent to sell the competing Caterpillar lift trucks. The primary factor driving these negotiations was the threat that Raymond would terminate the dealership agreement pursuant to Paragraph 18 if MN Supply did not agree to amend the terms. By 1993, the parties had negotiated an amendment (the 1993 Amendment) under which MN Supply agreed to create a separate and independent division for the sale of Caterpillar narrow-aisle lift trucks. The 1993 Amendment also required MN Supply to maintain the market share for Raymond lift trucks that MN Supply had achieved in 1992, and it gave Raymond the right to terminate the dealership agreement if these

---

[1]The Caterpillar lift trucks were manufactured by Raymond but were marketed and sold under the Caterpillar brand by Mitsubishi Caterpillar Forklift America. The District Court ruled that Raymond should not be considered the manufacturer of the Caterpillar trucks for purposes of MN Supply's claims. See Trial Tr. at 1705; Mem. Op. & Order of Sept. 26, 2003, at 13 n.7. Neither party has challenged this ruling on appeal.

conditions were not met. After the parties executed the 1993 Amendment, MN Supply began selling the competing line of Caterpillar lift trucks.

By 1995, Raymond's market share in MN Supply's territory had diminished substantially. Raymond expressed its concern to MN Supply, and MN Supply asked for a year's time to improve. In addition, MN Supply submitted to Raymond a business plan and performance objectives but nevertheless failed to reach the required performance levels over the next year. Raymond served notice to MN Supply on December 31, 1996, that it wished to terminate the dealership agreement, and Raymond denied MN Supply's request to provide a further extension to the agreement. The parties then began the process of terminating their fifty-year relationship.

The 1990 dealership agreement provided that as part of the termination process, Raymond would repurchase certain parts and inventory from MN Supply. The parties met in April 1997 to discuss this repurchase and other transitional issues. After the meeting, Raymond sent MN Supply a document entitled Termination by Mutual Consent (TMC) to spell out some of the termination issues. This document included a release of any claims by MN Supply against Raymond. The parties had several conversations regarding the TMC, and during the process of negotiating, Raymond informed MN Supply that Raymond would not move forward with the parts repurchase unless the TMC was finalized.

Further negotiations ensued, and MN Supply returned to Raymond a modified draft of the TMC it had received from Raymond. The modified draft included a release of any claims by Raymond against MN Supply similar to the release MN Supply had been asked to sign. MN Supply's modified draft of the TMC also declared Minnesota law as controlling the agreement, which was contrary to Raymond's original draft declaring New York law as controlling. MN Supply's president had signed the modified draft of the TMC before sending it to Raymond, but MN Supply never received a signed copy of the modified draft back from Raymond. In fact, MN

-4-

Supply heard nothing more about the TMC until after the termination. Raymond claims its vice president of sales received the modified draft, signed it, and placed it in Raymond's file without sending a signed copy back to MN Supply. In any event, the parties moved forward with the inventory and parts repurchase, and they eventually terminated their relationship. Raymond immediately awarded MN Supply's former territory to a newly formed dealership that was a subsidiary of Raymond.

In 1999, MN Supply brought this diversity action in federal court, claiming three violations of HUEMDA. MN Supply first claimed that Raymond had unlawfully coerced MN Supply into agreeing to the 1993 Amendment by threatening to terminate the dealership agreement if MN Supply sold the Caterpillar narrow-aisle lift trucks. MN Supply next claimed that the 1993 Amendment constituted a change in competitive circumstances imposed by Raymond without good cause. Finally, MN Supply claimed that Raymond's termination of the dealership agreement in 1997 was without good cause because it was based on MN Supply's failure to meet unreasonable terms set forth in the 1993 Amendment. Each party moved for summary judgment, with Raymond arguing, inter alia, that the suit was barred by the release of claims contained in the TMC and with MN Supply countering that the TMC was never formed. The court granted MN Supply's motion in part, finding that because Raymond never sent a signed copy of the TMC back to MN Supply, the release of claims contained in the TMC was not enforceable. The court denied Raymond's motion for summary judgment and the remainder of MN Supply's motion, and the parties prepared for a jury trial.

Prior to trial, the District Court held a jury-instruction conference at which Raymond sought to have the jury instructed that the TMC's release provision was an affirmative defense to MN Supply's claims, notwithstanding the partial grant of summary judgment in favor of MN Supply on the issue. MN Supply filed a motion in limine arguing that any evidence of the TMC should be suppressed pursuant to the

District Court's summary judgment order. In response to MN Supply's motion in limine, Raymond brought forward alleged new evidence that it had indemnified MN Supply in a product-liability suit in 1997 and that this indemnification was pursuant to the terms of the TMC. This evidence, Raymond claimed, indicated that the TMC had indeed been formed. The District Court agreed with MN Supply, ruling that the evidence of indemnification should have been produced at the summary judgment stage and that no evidence of the TMC could be produced to the jury.

At trial, as evidence of damages, MN Supply produced an expert who testified that MN Supply had lost more than $14 million as a result of the 1997 termination of the dealership agreement. In reaching the amount of lost profits occurring before and after trial, the expert had present-valued certain portions of the actual losses claimed. Raymond objected, arguing that MN Supply's expert had included prejudgment interest in his estimate of damages, which by statute was to be calculated by the court, not the jury. See Minn. Stat. § 549.09. The District Court allowed the expert's testimony and proposed to resolve the issue of prejudgment interest after the verdict.

After MN Supply finished presenting its case, Raymond moved for judgment as a matter of law (JAML) pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The District Court denied Raymond's motion for JAML, stating that there were issues to be decided by the jury. Raymond failed to renew its motion for JAML at the close of all evidence, and the District Court submitted MN Supply's claims to the jury. The jury returned verdicts in favor of MN Supply on all of its claims and awarded damages in the exact amount to which MN Supply's expert had testified.

After the verdicts were returned, Raymond again moved for JAML on all of MN Supply's claims or, in the alternative, for a new trial. MN Supply countered that Raymond had waived the opportunity to argue for JAML by not renewing its motion at the close of all evidence. The District Court disagreed with MN Supply on the waiver issue and went on to deny most of Raymond's motion for JAML on the merits.

The District Court partially granted Raymond's motion by ruling that the damages award, based as it was on the testimony of MN Supply's expert, included prejudgment interest, and the court reduced the award by almost $1.7 million. The District Court denied Raymond's alternative motion for a new trial. MN Supply then moved to amend the judgment by adding statutory prejudgment interest, and the District Court granted MN Supply's motion. As the prevailing party, MN Supply moved for an award of attorney fees and costs as provided in HUEMDA. The District Court granted MN Supply's motion, but awarded MN Supply an amount less than what MN Supply had requested—most significantly discounting the amount requested for MN Supply's damages expert.

Raymond appeals the partial grant of summary judgment barring its defense based on the release-of-claims provision in the TMC, appeals the denial of its motions for JAML or a new trial, appeals the award of damages, and appeals the award of certain attorney fees. MN Supply cross-appeals the reduction of the damages award and the amount awarded in expert witness fees.

II.

A.

The first question Raymond has raised for our review is whether the District Court erred in its partial grant of summary judgment to MN Supply by determining that, as a matter of law, the TMC was never formed. We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. Cameo Homes v. Kraus-Anderson Constr. Co., 394 F.3d 1084, 1087 (8th Cir. 2005). We will affirm if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. (citing Fed. R. Civ. P. 56(c)). Our review of the evidence includes only the record that was before the District Court when it ruled on the summary judgment motion. Id. at 1088 n.2 (citing

Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1489–90 (8th Cir. 1992), cert. denied, 506 U.S. 1080 (1993)).

Under Minnesota law, the existence of a contract is a question of fact ordinarily decided by the jury. Herron v. Green Tree Acceptance, Inc., 411 N.W.2d 192, 195 (Minn. Ct. App. 1987). Delivery of a written contract is usually an essential element of execution because it provides "an overt, objective manifestation" of a party's intent to enter the contract. Nodland v. Chirpich, 240 N.W.2d 513, 517 (Minn. 1976). But "where one to whom an offer is made goes ahead and performs in accordance with the offer," that performance constitutes acceptance of the offer. Johnson v. M.J. O'Neil, Inc., 234 N.W. 16, 17 (Minn. 1931). If reasonable minds could differ as to whether Raymond performed the terms of the TMC, and thereby accepted the TMC as modified by MN Supply, then summary judgment was improper.

It is undisputed that Raymond failed to send a signed copy of the modified TMC back to MN Supply. Given that the TMC made no reference to the equipment repurchase, Raymond argues, in effect, that Raymond made the execution of the TMC a condition precedent to moving forward with the equipment repurchase. Because Raymond repurchased the equipment, Raymond contends that this condition precedent was satisfied. By extension, Raymond asks us to infer that by repurchasing the equipment from MN Supply, Raymond communicated its acceptance of the TMC, thus forming the agreement that would bar MN Supply's claims.

Even viewing the evidence in the light most favorable to Raymond, we cannot draw the requested inference. MN Supply's modification of the TMC added a broadly worded release of claims by Raymond that mirrored the release Raymond was seeking from MN Supply. The modified draft also differed from Raymond's proposed draft in its declaration as to which state's law would govern the agreement. Thus, the modified draft MN Supply signed and sent to Raymond was a substantially different document than the draft MN Supply had received from Raymond. Without any other

expressed assent or performance of the agreement, we cannot infer a meeting of the minds, given Raymond's silence and lack of further negotiation.

Nor can we infer that the equipment repurchase, which we reiterate was not required by the TMC, communicated an acceptance of that agreement. Raymond, when faced with a new draft of the TMC releasing all claims against MN Supply, may have abandoned its own desire for a release of claims, instead deciding to move forward with the equipment repurchase as planned. Further, MN Supply produced evidence that the equipment repurchase was already required by the dealership agreement, which would have prevented Raymond from making the TMC a condition precedent to the repurchase. In any event, we simply cannot make the inference of acceptance Raymond requests without some evidence that Raymond performed under the TMC as modified by MN Supply. Such evidence was missing from the record before the District Court when it granted MN Supply's motion. We therefore affirm the District Court's partial grant of summary judgment to MN Supply.

B.

We next must decide whether the District Court erred by refusing to reconsider its partial grant of summary judgment to MN Supply when faced with Raymond's alleged newly discovered evidence. A threshold question is whether the District Court's "refusal" is properly before this Court on review. It is undisputed that Raymond failed to file a motion for relief from the District Court's partial summary judgment order. See Fed. R. Civ. P. 60(b). Instead, it appears Raymond first argued for effective reconsideration in its request for jury instructions and then again in opposition to MN Supply's motion in limine, which sought to limit any reference to the TMC in accordance with the summary judgment order. Raymond again argued for effective reconsideration in its post-verdict motion for JAML. Because the District Court considered Raymond's alleged new evidence in the context of its rulings on these other motions, we will, out of an abundance of caution, treat the District Court's

rulings as reconsideration of its partial summary judgment order pursuant to Rule 60(b)(2) (newly discovered evidence).[2]

We review for abuse of discretion the denial of a Rule 60(b) motion for relief from a summary judgment order. Broadway v. Norris, 193 F.3d 987, 989 (8th Cir. 1999). Such a motion is to be granted only in exceptional circumstances requiring extraordinary relief. Callanan v. Runyun, 75 F.3d 1293, 1296–97 (8th Cir. 1996). To be granted relief based on newly discovered evidence, the moving party must show that: 1) the evidence was only discovered after the summary judgment hearing, 2) the moving party exercised due diligence before the hearing, 3) the evidence is material and not merely cumulative or impeaching, and 4) consideration of the new evidence would likely produce a different result. Id. at 1297 (citation to quoted case omitted).

Raymond realized during depositions taken after the summary judgment order that it had defended and indemnified MN Supply against a product-liability claim in 1997. According to Raymond, this was new evidence that Raymond had performed the TMC, which, if formed, would have required the defense and indemnification that Raymond provided. The District Court twice denied effective reconsideration of its order based on this evidence, finding that Raymond should have been aware of the defense and indemnification at the summary judgment stage. In so ruling, the District Court did not abuse its discretion.

We have no doubt that the TMC, if formed, would have precluded MN Supply from bringing any of its claims against Raymond. Raymond, however, was aware of the provisions of the TMC and, when faced with a summary judgment motion challenging the agreement's formation, could have scoured its records for evidence of having performed the terms of the agreement. Had Raymond done so, it likely would

---

[2]We express no opinion about whether a party who failed to file a motion for relief from a summary judgment order under Rule 60(b) is precluded from petitioning for reconsideration of the order in the context of a different motion.

-10-

have discovered (or recalled) that it had defended and indemnified MN Supply only a few years earlier. More importantly, Raymond has offered no reason why this evidence *could not* have been discovered with due diligence before the summary judgment hearing. That Raymond failed to exercise due diligence does not make the evidence new, nor does its failure justify extraordinary relief from judgment under Rule 60(b). Insofar as the District Court denied Raymond's motion for relief from the partial summary judgment order, we affirm.

III.

Raymond next claims that the District Court erred by allocating to Raymond the burden of showing that it had good cause to terminate the dealership agreement. See Minn. Stat. § 325E.0681 subd. 1 (requiring good cause for an equipment manufacturer to terminate a dealership agreement). After de novo review, we sustain the District Court's reading of state law on this point. See Eichenwald v. Small, 321 F.3d 733, 736 (8th Cir. 2003) (standard of review). In interpreting state law, "we are bound by the decisions of the state's highest court." Id. "When a state's highest court has not decided an issue, it is up to this court to predict how the state's highest court would resolve that issue." Continental Cas. Co. v. Advance Terrazzo & Tile Co., 462 F.3d 1002, 1007 (8th Cir. 2006). Decisions of intermediate state appellate courts are persuasive authority that we follow when they are the best evidence of what state law is. Id.

To our knowledge, the question of who has the burden of proof under HUEMDA has not been litigated in the Supreme Court of Minnesota. The Minnesota Court of Appeals, however, squarely placed the burden of showing good cause on the equipment manufacturer in River Valley Truck Ctr., Inc. v. Interstate Cos., 680 N.W.2d 99, 104 (Minn. Ct. App. 2004) ("The equipment manufacturer has the burden of proving the existence of good cause to not renew a dealership agreement."). On appeal, the Minnesota Supreme Court affirmed this opinion and while it is unclear

whether allocation of the burden of proof was at issue on appeal, stated that HUEMDA "requires an 'equipment manufacturer' . . . to demonstrate 'good cause.'" River Valley Truck Ctr., Inc. v. Interstate Cos., 704 N.W.2d 154, 158 (Minn. 2005) (quoting Minn. Stat. § 325E.0681 subd. 1).  In view of this statement by the Supreme Court of Minnesota, we cannot say that the District Court erred when it allocated the burden of proof to Raymond.

IV.

Raymond further claims that the District Court erred by denying its post-verdict motion for JAML under Rule 50(b).  In response, MN Supply argues that having only moved for JAML at the close of plaintiff's evidence and failing to renew its motion at the close of all evidence, Raymond waived the right to argue for JAML.  See Fed. R. Civ. P. 50(b).  MN Supply made this argument to the District Court but the court disagreed, ruling that Raymond fell within the exception to the renewal requirement applied in BE & K Constr. Co. v. United Bhd. of Carpenters, 90 F.3d 1318 (8th Cir. 1996).  The standard of review to be applied to the District Court's decision is not evident from our prior cases, but given that the decision involved an exercise of the District Court's discretion, we review for abuse of that discretion.

Ordinarily, a party who fails to renew a Rule 50(a) motion at the close of all evidence may not argue for JAML after a jury verdict has been rendered.  See Mathieu v. Gopher News Co., 273 F.3d 769, 776 (8th Cir. 2001).  "The language and traditional application" of Rule 50(b) are both clear and clearly established in this Circuit.  Id. at 777.  The exception applied in BE & K, however, allows a party to argue there was insufficient evidence to support the verdict if the party made its Rule 50(a) motion shortly before the close of all evidence and the court indicated in some way that the motion need not be renewed at the close of all the evidence to preserve the party's right to challenge the verdict.  BE & K, 90 F.3d at 1325; Douglas County Bank & Trust Co. v. United Fin. Inc., 207 F.3d 473, 477 (8th Cir. 2000).  The District

Court ruled that both of these elements were satisfied as to Raymond's post-verdict motion for JAML. Although the question is a close call, we cannot say that the District Court abused its discretion in holding that Raymond qualified for the BE & K exception.

For scheduling reasons, the District Court deferred argument and ruling on Raymond's Rule 50(a) motion—made at the close of MN Supply's evidence—until later in the trial, after the majority of Raymond's live witnesses had been presented. Although the District Court flatly denied Raymond's Rule 50(a) motion without taking "any portion of the motion under advisement," Mem. Op. & Order of Sept. 26, 2003, at 5, the court ruled that its failure to take the motion under advisement was "not significant" given its "unequivocal statement that [MN Supply] had presented issues that had to be determined by a jury," id. at 6. The District Court was in the best position to interpret the proceedings and its own statement as indicating that Raymond need not renew its Rule 50(a) motion at the close of all evidence.

Further, during the one-day period between the hearing of Raymond's motion and the close of all evidence, Raymond presented only two more witnesses and MN Supply did not present any rebuttal witnesses. While the parties dispute the quantity and quality of evidence produced between the hearing of Raymond's motion and the close of all evidence, the District Court heard these arguments and held that Raymond qualified for the BE & K exception. The court then proceeded to address the merits of Raymond's motion for JAML. Finding no reason to disturb the District Court's decision regarding the exception, we turn to the merits of Raymond's motion for JAML.

V.

The District Court's denial of Raymond's motion for JAML is a matter of law that we review de novo, applying the same standards as the District Court. Douglas County Bank, 207 F.3d at 477. We ask whether sufficient evidence supports the jury's verdict, viewing the evidence in the light most favorable to the party who prevailed at trial. Id. "We will uphold the jury's verdict unless we conclude a reasonable jury could not have found for [MN Supply.]" Pittari v. Am. Eagle Airlines, Inc., 468 F.3d 1056, 1061 (8th Cir. 2006).

The jury determined that MN Supply prevailed on each of its three HUEMDA claims. We address whether judgment as a matter of law should have been granted on each claim in turn.

A.

MN Supply's first claim arises from HUEMDA § 325E.0682(b)(2), which makes it illegal for a manufacturer to coerce a dealer into refusing to purchase equipment manufactured by another manufacturer. MN Supply alleges that Raymond coerced it into executing the 1993 Amendment by demanding that MN Supply not carry the Caterpillar narrow-aisle line of lift trucks. Raymond's primary argument in support of its motion for JAML is that this claim necessarily fails because the evidence at trial established that MN Supply never refused to purchase Caterpillar narrow-aisle lift trucks and HUEMDA does not prohibit attempted coercion that has no result. Raymond also asserts that it did not attempt to keep MN Supply from carrying the competing Caterpillar trucks, but simply exercised its right under Paragraph 18 of the dealership agreement and put legitimate pressure on MN Supply to remain focused on selling Raymond trucks. We agree with MN Supply that Raymond threatened to terminate the dealership agreement before negotiating the 1993 Amendment. See Letter from Dinn to Koch of Apr. 22, 1993 (invoking

-14-

Raymond's right to terminate the dealership agreement pursuant to Paragraph 18 unless MN Supply agreed to new conditions); Letter from Dinn to Koch of Oct. 27, 1993 (same). The question, however, is whether this threat was coercion within the ambit of HUEMDA.

Prior to trial, Raymond argued that the jury would need guidance as to whether, in order to constitute a violation of the statute, the result of the coercion must be a refusal to purchase the equipment of another manufacturer. The District Court chose to instruct the jury that coercion is "conduct that constitutes the improper use of economic power to compel another to submit to the wishes of one who wields it." Trial Tr. at 1908. The court then instructed the jury that in order for MN Supply to prevail, the jury had to find, inter alia, that Raymond "sought to coerce" MN Supply into refusing to carry the competing Caterpillar line. Id. It was thus left to the jury to decide whether Raymond's threat to terminate the dealership agreement under Paragraph 18 equated with coercion of MN Supply to refuse to purchase another manufacturer's equipment. In ruling on Raymond's post-verdict motion for JAML, the District Court interpreted HUEMDA to prohibit *attempted* coercion by a manufacturer as well as actual coercion. The court then held that Raymond "coerced [MN Supply], in violation of the statute, when [Raymond] attempted to force [MN Supply] into a refusal to carry the CAT line." Mem. Op. & Order of Sept. 26, 2003, at 15–16. Thus, only after interpreting the statute as encompassing attempted coercion did the court hold that the evidence was sufficient to support the jury's verdict of a HUEMDA violation.

Because our review of Raymond's motion for JAML requires a review of the District Court's post-verdict interpretation of HUEMDA, our review exceeds the scope of a typical Rule 50 review of the sufficiency of the evidence. See Fed. R. Civ. P. 50(a)(1). We believe that our review of the District Court's post-verdict interpretation of HUEMDA is proper because it was necessary for the District Court to interpret HUEMDA in ruling on Raymond's motion for JAML, and the court's

interpretation—that HUEMDA prohibited attempted coercion—was a decisive factor in its denial of Raymond's motion. See Mem. Op. & Order of Sept. 26, 2003, at 12-16. Raymond argues that the District Court's post-verdict interpretation of HUEMDA as including attempted coercion is erroneous and that under a correct interpretation—which would require a showing that a dealer refused to purchase a competitive product—the evidence is insufficient to support a finding of coercion. MN Supply counters that the evidence supports the verdict given the District Court's jury instructions and post-verdict interpretation of HUEMDA.

Statutory interpretation is a question of law that we review de novo. Metro Motors v. Nissan Motor Corp., 339 F.3d 746, 749 (8th Cir. 2003). Under HUEMDA § 325E.0682(b)(2), an equipment manufacturer may not "coerce an equipment dealer into a refusal to purchase the equipment manufactured by another equipment manufacturer." No variation of the words "attempt" or "seek to" are used in connection with HUEMDA's prohibition on coercion. In contrast, other subdivisions of § 325E.0682(b) do reference "attempt." See Minn. Stat. § 325E.0682(b)(1) (making it a violation of HUEMDA to "condition *or attempt to* condition" the sale of equipment on the purchase of other goods (emphasis added)), (b)(4) (making it a violation of HUEMDA to "*attempt* or threaten to terminate" the dealership agreement if the attempt or threat is based on certain circumstances beyond the dealer's control) (emphasis added)).

We are satisfied that HUEMDA does not prohibit a manufacturer's efforts to persuade a dealer not to purchase equipment from a rival manufacturer. In reaching this conclusion, we are not swayed by MN Supply's efforts to analogize HUEMDA with the Minnesota Motor Vehicle Sale and Distribution Act (MVSDA), see id. §§ 80E.01–80E.18, to equate Raymond's threat of termination with unlawful coercion. The statutes contain materially different language, and the attempt to analogize the two statutes overlooks those differences. MVSDA specifically prohibits a manufacturer from "*threatening* to cancel a franchise or any contractual agreement,"

id. § 80E.12(e) (emphasis added), and from "us[ing] any written instrument . . . to *attempt* to nullify or modify any provision" in the Act, id. § 80E.135 (emphasis added), including the provision that prohibits a manufacturer from terminating a dealer solely for breaching an exclusivity agreement, see id. § 80E.07 subd. 1(c). By contrast, the HUEMDA coercion provision does not use the word "attempt," nor does it mention termination, either threatened or actual. We conclude that to be prohibited by HUEMDA § 325E.0682(b)(2), a manufacturer's action must be coercive and its result must be a dealer's refusal to purchase another manufacturer's equipment. The District Court erred in ruling otherwise.

There is no evidence that MN Supply refused to purchase another manufacturer's equipment. Having discovered that MN Supply planned to sell the competing Caterpillar line, Raymond sought to "ensure the continued competitive presence of Raymond products in the markets [served by MN Supply]." Letter from Colquhoun to Koch of Aug. 6, 1992, at 1 (internal quotes and capitalization omitted). Raymond also sought to ensure that MN Supply did not "divert time and attention from the agressive representation of [Raymond's] products in the marketplace." Id. Accordingly, Raymond gave MN Supply the option of either terminating the dealership agreement or changing MN Supply's obligations under the agreement. By negotiating the 1993 Amendment, Raymond *consented to* MN Supply's purchasing of the competing Caterpillar narrow-aisle lift trucks, consistent with Paragraph 18 of the dealership agreement. There is no evidence that MN Supply was coerced into accepting Paragraph 18, nor that MN Supply ever challenged the legality of Paragraph 18 while enjoying the benefits of the agreement. We hold that Raymond's threatened exercise of its right under Paragraph 18 to terminate the dealership agreement did not coerce MN Supply into refusing to purchase another manufacturer's equipment.

Implicit in this holding is our conclusion that Paragraph 18 was not voided by HUEMDA. We do not believe that HUEMDA prohibits a manufacturer from terminating a dealership agreement with a dealer who chooses to offer competing

-17-

equipment where that termination was expressly provided for in the agreement. HUEMDA specifies that a manufacturer may terminate a dealership agreement for "good cause." Minn. Stat. § 325E.0681 subd. 1. The statute also contains a section specifying HUEMDA violations. See id. § 325E.0682. Notably absent from HUEMDA is any prohibition on terminating a dealership agreement based on the violation of an exclusivity provision. If the Minnesota legislature had wanted to limit the use of exclusivity provisions in the heavy and utility equipment industry, it could have done so explicitly, as it has done in the automotive industry, id. § 80E.07 subd. 1(c). MVSDA, unlike HUEMDA, specifically prohibits the termination of a dealership agreement based solely on a dealer's sale of another manufacturer's vehicles, regardless of any contractual provisions to the contrary. See id.; see also Metro Motors, 339 F.3d at 752 (ruling that MVSDA does not prohibit exclusivity provisions in dealership agreements but does limit how manufacturers may enforce those provisions). The fact that HUEMDA was enacted eight years after MVSDA suggests that the Minnesota legislature was aware of MVSDA's language and chose different language for HUEMDA. In the absence of such explicit language, we will not read a prohibition against exclusivity provisions into HUEMDA.[3]

Because § 325E.0682(b)(2) only prohibits coercion that results in a dealer's refusal to purchase equipment manufactured by another manufacturer and it is undisputed that MN Supply did not refuse to purchase the Caterpillar lift trucks, we reverse the denial of Raymond's motion for JAML on this claim.

---

[3]MN Supply's interpretation of HUEMDA would effectively render exclusivity provisions ineffectual because any provision allowing a manufacturer to terminate an agreement once it became nonexclusive would be deemed coercive, void, and unenforceable. Further, any attempt to bargain for an exclusivity provision or to sue for its breach would not only be futile but could also be deemed coercive inasmuch as it would seek to prevent the purchase of another manufacturer's equipment.

-18-

B.

MN Supply's second claim was that Raymond violated HUEMDA by substantially changing the competitive circumstances of the dealership agreement without good cause. See Minn. Stat. § 325E.0681 subd. 1. MN Supply alleged that the 1993 Amendment imposed substantial and costly changes to the dealership agreement that were not founded on good cause because Paragraph 18, the authority relied upon by Raymond for implementing the amendment, was invalid. In support of its motion for JAML, Raymond argues that the 1993 Amendment did not change the competitive circumstances and, in any event, Paragraph 18 was valid and permitted Raymond to impose conditions upon MN Supply when MN Supply chose to sell a competing product. We conclude that while the evidence supports the jury's finding that the 1993 Amendment imposed a change of competitive circumstances that adversely affected MN Supply, see Astleford Equip. Co. v. Navistar Int'l Transp. Corp., 632 N.W.2d 182, 191 (Minn. 2001) (defining change in competitive circumstances), Raymond succeeded in proving that it had good cause to implement the change, and JAML should have been granted on this basis.

HUEMDA defines "good cause" as the "failure by an equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement, if the requirements are not different from those requirements imposed on other similarly situated dealers by their terms." Minn. Stat. § 325E.0681 subd. 1. The exclusivity provision found in Paragraph 18 of the dealership agreement was an essential and reasonable requirement imposed upon MN Supply. Ordinarily, a manufacturer behaves reasonably in selling equipment only to dealers who in return promise to focus exclusively on the manufacturer's products. The exclusive dealership that results from such an agreement, in the absence of any controlling legislation to the contrary, may reasonably be deemed essential by manufacturers in their quest to maintain a profitable share of a competitive market. As we determined above, HUEMDA did not invalidate Paragraph 18. Thus, when

-19-

MN Supply sought to sell Caterpillar lift trucks that directly competed with Raymond lift trucks, Raymond could lawfully have terminated the dealership agreement under Paragraph 18 and proceeded with naming a new dealer in the territory. MN Supply accepted the requirements of the 1993 Amendment as a cost of continuing to represent Raymond's products while simultaneously representing Caterpillar's products. Given our reading of HUEMDA, there was no evidence to support the jury's finding that Raymond imposed a change in the competitive circumstances of the Dealership agreement without good cause.[4] Consequently, we reverse the denial of Raymond's motion for JAML on this claim.[5]

---

[4]Raymond further argues that the changed market-share standards imposed by the 1993 Amendment could not have been used to support a finding that Raymond violated § 325E.0681 subd. 1 because § 325E.0681 subd. 1(h) recognizes a manufacturer's right to unilaterally impose *reasonable* market-penetration requirements upon dealers. We reject this argument because, as we discuss in detail infra, the market-penetration requirements imposed by the 1993 Amendment were not reasonable. Nonetheless, because § 325E.0681 subd. 1 does not state that the changed competitive circumstances must be reasonable, but only requires that the provision of the dealership agreement that the manufacturer is enforcing (here, Paragraph 18) be reasonable, Raymond should have succeeded on its motion as it relates to this claim.

[5]In its brief, MN Supply states that Raymond created the overall "conflict" by manufacturing the new line of competitive equipment under the Caterpillar label. Br. of MN Supply at 11. In so doing, MN Supply implies that this alleged conflict created by Raymond changed the competitive circumstances of the dealership agreement. To the extent that MN Supply advances this argument, we find it without merit. As previously noted, supra note 1, the District Court rejected the claim that Raymond should be considered the manufacturer of Caterpillar lift trucks for purposes of this litigation, and that decision has not been appealed.

C.


MN Supply's third claim was that Raymond terminated the dealership agreement in 1997 without good cause in violation of HUEMDA § 325E.0681 subd. 1. MN Supply asserted that Raymond terminated the agreement due to MN Supply's failure to meet requirements imposed in the 1993 Amendment, which requirements were unreasonable and different than those imposed upon similarly situated dealers. We conclude that the evidence supports the jury's verdict for MN Supply on this claim.


HUEMDA states that "[n]o equipment manufacturer . . . may terminate . . . a dealership agreement without good cause." Minn. Stat. § 325E.0681 subd. 1. As discussed above, "good cause" is defined as the "failure by an equipment dealer to substantially comply with essential and *reasonable* requirements imposed upon the dealer by the dealership agreement, if the requirements are not different from those requirements imposed on other similarly situated dealers by their terms." Id. (emphasis added). In addition, good cause exists when the "dealer, after receiving notice from the manufacturer of its requirements for *reasonable* market penetration based on the manufacturer's experience in comparable market areas, consistently fails to meet the manufacturer's market penetration requirements." Id. subd. 1(h) (emphasis added).[6] Raymond argues that because it had a right to negotiate the 1993 Amendment when MN Supply began selling the competing Caterpillar line, it necessarily had good cause to terminate the dealership agreement when MN Supply "consistently fail[ed] to meet th[e] market penetration requirements" imposed in the

---

[6]Although the statute provides other means for a manufacturer to establish good cause, none are relevant here.

amendment. Br. of Raymond at 48.[7] We believe that Raymond's argument reflects an incorrect understanding of HUEMDA on two levels. First, under the "good cause" analysis, whether a manufacturer has a right to impose—and a dealer has agreed to—the requirements in the dealership agreement is not a consideration. Second, a dealer's failure to meet the requirements in a dealership agreement does not by itself give a manufacturer good cause to terminate. Rather, the manufacturer must also prove that the requirements with which the dealer is not complying are reasonable (and if proceeding under the introductory language to subdivision 1, "essential" and "not different from those requirements imposed on other similarly situated dealers"). Minn. Stat. § 325E.0681 subd. 1.

The jury determined that Raymond terminated the dealership agreement without good cause. Because there is evidence in the record that the requirements imposed in the 1993 Amendment were not reasonable, we cannot say that a reasonable jury could not have found in favor of MN Supply.[8] Under the 1993 Amendment, MN Supply was required to "improve, or at least maintain, its Raymond market share" for three classes of trucks. Letter from Dinn to Koch of Oct. 27, 1993, at 1. At trial, Robert

---

[7]Raymond did not directly challenge—either before the District Court or on appeal—the verdict in favor of MN Supply on MN Supply's wrongful termination claim. Rather, Raymond's position appears to be that if the 1993 Amendment was validly entered, then Raymond had good cause to terminate MN Supply when MN Supply did not meet the requirements imposed therein. Without deciding whether Raymond waived the right to challenge the denial of JAML on this third claim, we address Raymond's argument.

[8]There is also ample evidence to support the jury's finding that Raymond terminated the dealership agreement without the consent of MN Supply. See Letter from Bennett to Stromsness and Koch of Dec. 31, 1996 ("In view of the Dealership performance and your Management's inability to stop the trend towards lower market share, The Raymond Corporation will exercise it's [sic] right to terminate the Dealer Sales Agreement in accordance with its provisions."); Letter from Bennett to Koch of Jan. 16, 1997 ("Raymond will terminate our agreement effective April 30, 1997.").

Koch, the President of MN Supply from 1990 to 1997, testified extensively about the "unrealistic" nature of these market-share requirements. Trial Tr. at 303. According to Koch, the requirements were unreasonable because "although [MN Supply] had achieved this level of performance in the past, the likelihood of being able to continue at that level was not very good because of some significant changes in our marketplace." Id. at 295. Koch explained that in early 1993, Supervalu, a customer historically comprising ten to twenty-five percent of MN Supply's sales, became a national account, thereby placing orders (if any) directly with Raymond rather than going through the MN Supply dealership. Around the same time period, Target Corporation, which purchased lift trucks from Raymond competitor Crown, began aggressively expanding and became the single-largest purchaser of narrow-aisle lift trucks in MN Supply's territory, thereby negatively impacting MN Supply's market share. MN Supply expressed concern to Raymond that even if MN Supply increased its lift truck sales, its market share would shrink in the face of the large Crown orders projected for Target Corporation. Koch testified that given the changes with Supervalu and Target Corporation, "there was virtually no way we were going to achieve [the market-share] goals." Id. at 312; see also Letter from Koch to Dinn of June 1, 1993 (expressing concern over the market-share benchmark for lift trucks set in the 1993 Amendment because of the potential effect of Target Corporation's and Supervalu's plans). Despite MN Supply's concerns about the market-share requirements, Koch testified that he signed the 1993 Amendment because the MN Supply board of directors "felt that we were under the gun. We really didn't have any options." Trial Tr. at 321.

MN Supply's concerns were justified. Koch testified that MN Supply could not achieve the market-share benchmarks because "[t]he market was in a very dynamic state." Id. at 362. Despite selling 50% more trucks in 1994 than in 1992, for example, MN Supply's market share dropped. Id. MN Supply presented evidence that Raymond refused its requests to have purchases by the Target Corporation excluded from the analysis of MN Supply's market share in order to arrive at a more realistic

-23-

performance benchmark, even though Raymond excluded the purchases by other large retailers (such as Wal-Mart and Home Depot) from the market-share calculations of other dealers. Although it could not meet the market-share benchmarks in the amendment, MN Supply received the "Dealer of Merit" award for being "one of Raymond's better dealers" in three of the four years that the amendment was in place—from which the jury could have inferred that the market-share benchmarks were unreasonably high. Id. at 334.

In addition to setting market-share benchmarks, the 1993 Amendment required MN Supply to "improve, or at least maintain, its dollar volume of parts per truck of population" sales. Letter from Dinn to Koch of Oct. 27, 1993, at 1. Koch told the jury that this parts-purchase requirement created "unachievable goals" because the benchmark was based on inaccurate reports that overestimated the number of Raymond trucks in use in MN Supply's territory. Trial Tr. at 304. This is further evidence from which the jury could have found the conditions in the 1993 Amendment unreasonable.

After hearing all of Koch's testimony, a reasonable jury could have found the performance requirements in the 1993 Amendment unreasonable and more stringent than those imposed on similarly situated dealers. As such, MN Supply's failure to comply with the requirements would have been insufficient under HUEMDA to give Raymond good cause to terminate. The District Court properly upheld the jury's verdict on this claim.

VI.

Because we have affirmed the District Court's entry of judgment on MN Supply's wrongful termination claim, we must address the parties' arguments relating

-24-

to the award of damages, attorney fees, and actual costs. HUEMDA permits the successful dealer-plaintiff to collect "damages sustained by the dealer as a consequence of the manufacturer's violation, together with the actual costs of the action, including reasonable attorney's fees." Minn. Stat. § 325E.0684. Both parties challenge aspects of the District Court's award of damages, fees, and costs. For the reasons discussed below, we affirm the damages award, vacate the award of fees and costs, and remand the case for a new calculation of fees and costs that considers the outcome of this appeal.

A.

Both parties present challenges to the damages award. At trial, MN Supply introduced the testimony of Frederic Lieber, a damages expert who calculated MN Supply's total damages from the termination of the dealership agreement at $14,076,784.[9] In arriving at this total damages figure, Lieber calculated the profits lost by MN Supply prior to trial at $4,196,271 and then present-valued that amount to $5,886,819. Before the case was submitted to the jury, Raymond argued that the difference between the two amounts—approximately $1.7 million—was prejudgment interest that, by state statute, may only be calculated by the court. See Minn. Stat. § 549.09. MN Supply countered that the amount was not prejudgment interest but, rather, was simply a component of the present-valuation of lost income. The District Court decided that it would allow Lieber's calculations to go to the jury and, if necessary, resolve the issue post-verdict. The jury returned a verdict for MN Supply

---

[9]Raymond concedes that the damage amount calculated by Lieber was based on damages caused by the termination of the dealership agreement and not by any other violation of HUEMDA. Accordingly, our decision reversing the District Court's denial of Raymond's motion for JAML on MN Supply's first claim (coercion) and second claim (change of competitive circumstances) does not in itself invalidate the award of damages.

in the exact amount calculated by Lieber. Thereafter, the District Court determined that the disputed $1.7 million was "best characterized as 'prejudgment interest'" and reduced the jury award by that amount. Mem. Op. & Order of Sept. 26, 2003, at 19, 20. The District Court then performed its own calculation of prejudgment interest pursuant to Minn. Stat. § 549.09 and arrived at an amount of $346,531.61, which it added to the damages award. Mem. Op. & Order of January 7, 2004, at 4.

On appeal, Raymond argues that the District Court erred in allowing Lieber's damages calculation including prejudgment interest to go to the jury. Raymond asserts that Lieber's entire opinion and report should have been stricken and a directed verdict entered for Raymond on all claims.[10] MN Supply cross-appeals, arguing that the District Court erred in deeming the $1.7 million prejudgment interest and in decreasing the jury's award of damages.

Whether the District Court properly characterized the $1.7 million as prejudgment interest rather than as part of the present-valuing calculation is a matter of Minnesota law that we review de novo. See Conwed Corp. v. Union Carbide Corp., 443 F.3d 1032, 1039 (8th Cir. 2006) (standard of review), citing Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991). As recognized by the District Court, no Minnesota case discusses the interplay between Minnesota's prejudgment-interest statute and the present-valuing of future or past damages from lost profits. Our Court has recognized, however, that in Minnesota, prejudgment interest "is designed to compensate the plaintiff for the loss of the use of the money owed." Simeone v. First Bank Nat'l Assoc., 73 F.3d 184, 191 (8th Cir. 1996). Lieber testified that he arrived at the $1.7 million figure by calculating the amount that MN Supply would have earned had it invested the profits it lost from 1997 to 2002 at an eighteen percent rate

_____

[10]MN Supply submitted no other evidence of damage.

-26-

of return.[11]  Trial Tr. at 809–10.  It appears to us that this figure therefore represents "prejudgment interest" under Minnesota law.  See ZumBerge v. N. States Power Co., 481 N.W.2d 103, 110 (Minn. Ct. App. 1992) (interpreting expert's "calculation of the time value of the losses, i.e., what the ZumBerges would have accrued in interest if they would have put the loss amount in the bank each year earning 10% interest" as "prejudgment interest" such that expert's calculation should not have been considered by the jury); Security Prot. Servs., Ltd. v. Evenson, Nos. C4-92-556, C8-92-561, C6-92-1336, 1993 WL 14338, *3 (Minn. Ct. App. Jan. 26, 1993) (holding that expert's calculation of "amount which [plaintiff] would have earned had it invested all of the money that it sought as damages" was evidence of prejudgment interest that should not have been considered by the jury).  We conclude that the District Court correctly determined that Lieber's analysis improperly included prejudgment interest which could only be calculated by the court.  The District Court properly re-calculated the prejudgment interest in accordance with Minnesota law and entered judgment for the reduced sum.[12]  Thus, MN Supply's cross-appeal fails.

We do not agree with Raymond, however, that JAML must be granted in its favor because the jury was allowed to consider Lieber's opinion including prejudgment interest.  When evidence of prejudgment interest is erroneously admitted at trial, an appellant is not entitled to a new trial unless it proves that it was prejudiced by the error.  See ZumBerge, 481 N.W.2d at 110.  Because the District Court reduced the damages award by the $1.7 million improperly included in Lieber's calculation

---

[11]Lieber's report indicates that the eighteen percent rate of return reflected Lieber's determination of MN Supply's cost of capital for equity and borrowed debt.

[12]Because the jury returned a verdict in the precise amount calculated by Lieber, there was no difficulty separating from the award the portion comprising prejudgment interest.  See C.L. Maddox, Inc. v. Benham Group, Inc., 88 F.3d 592, 603 (8th Cir. 1996) ("When it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, district courts possess the power to reduce the amount of the verdict accordingly.").

before correctly calculating the prejudgment interest according to Minnesota statute,[13] Raymond can establish no prejudice.

Raymond also argues that Lieber's opinion was not reliable and should have been stricken because Lieber (1) incorrectly assumed that the termination of the dealership agreement caused MN Supply to lose all income generated from the sale of Raymond parts, service, and used equipment, (2) artificially inflated the amount that MN Supply would have received in cash discounts for purchases from Raymond, and (3) based his calculation of lost commissions to be paid by Raymond to MN Supply on unsupported assumptions tying commissions to new equipment sales. Raymond asserts that because of these alleged errors, Lieber's opinion cannot as a matter of law support the jury's damages award. We review a district court's admission of expert testimony for abuse of discretion. Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 864 (8th Cir. 2004).

Raymond's objections to Lieber's opinion are more appropriately directed to the weight of the testimony, not its admissibility:

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

Id. at 865 (internal quotation marks and citations to quoted cases omitted). Raymond had an opportunity at trial to cross-examine Lieber regarding these matters, and it was

---

[13]The parties do not take issue with the District Court's mathematical computations performed in applying Minn. Stat. § 549.09.

within the province of the jury to evaluate issues of fact and credibility. We have examined the record and cannot say that Lieber's testimony was so unsupported that it could offer no assistance to the jury. Accordingly, the District Court did not abuse its discretion in refusing to strike the testimony.

We affirm the District Court's award of damages in all respects.

B.

Next, Raymond appeals the District Court's award of attorney fees and costs to MN Supply. Raymond's first basis for this challenge is inextricably linked with its argument on the merits: MN Supply should not have prevailed at trial and, therefore, should not have been awarded fees and costs as a prevailing party. MN Supply concedes that if it does not prevail on appeal, the District Court's judgment awarding fees and costs may not be enforced. Neither party addressed, however, the situation which we presently face: on appeal, we have concluded that MN Supply prevailed on its third claim (termination without good cause), but not on its first claim (coercion) or second claim (change of competitive circumstances). In Hensley v. Eckerhart, the Supreme Court ruled that "[w]here the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claims should be excluded in considering the amount of a reasonable fee." 461 U.S. 424, 440 (1983). The Court recognized, however, that when a plaintiff's claims "involve a common core of facts" or are "based on related legal theories . . . [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." Id. at 435. We believe that the District Court should have the first opportunity to address whether MN Supply's claims are distinct or whether they are related in such a way that much of the time of counsel was devoted to the litigation as a whole. If the District Court concludes that the claims are related, then it should go on to consider "the significance

-29-

of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Id. We therefore vacate the District Court's award of attorney fees and costs and remand the case for the District Court to address the issue anew in light of our holdings on appeal. Given this order of remand, the parties' remaining arguments related to fees and costs are moot.[14]

VII.

The judgment entered by the District Court on the jury verdict in favor of MN Supply is reversed on MN Supply's first and second claims, and affirmed on MN Supply's third claim. We remand the case and instruct the District Court to enter judgment as a matter of law in favor of Raymond on MN Supply's first and second claims, and to award damages, attorney fees, and costs to MN Supply consistent with this opinion.

_____

---

[14]Raymond argues that the District Court abused its discretion in awarding attorney fees for partially redacted time entries that the court examined *in camera* but did not disclose to Raymond because they were protected by the attorney-client privilege or the attorney work-product doctrine. MN Supply cross-appeals, arguing that the District Court abused its discretion by not awarding the full amount of Lieber's expert witness fees. While it is, of course, within the parties' discretion to raise these issues again on remand, we remind the parties that the District Court has substantial discretion in awarding fees and costs. See Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1072 (8th Cir. 2000) (costs); Litton Microwave Cooking Prods. v. Leviton Mfg. Co., 15 F.3d 790, 796 (8th Cir. 1994) (fees).